IN THE MATTER OF ABRAHAM J. ISSERMAN, AN ATTORNEY AND COUNSELLOR AT LAW OF NEW JERSEY.

Argued June 18, 1951 and March 17, 1952—
Decided March 24, 1952.

270

[redacted]

Name of respondent to be stricken from the rolls.

[redacted]

For the order: *Mr. Frederick C. Vonhof.*

For the respondent: *Mr. Milton M. Unger.*

The opinion of the court was delivered by

VANDERBILT, C. J. The respondent, Abraham J. Isserman, was admitted as an attorney-at-law of this State in 1923 and as a counsellor in 1926. On October 25, 1949, Isserman was noticed to appear before the Ethics Committee of the Essex County Bar Association on November 3, 1949. He did not appear personally but was represented by counsel who offered various documents in evidence. On November 7, 1949, the Ethics Committee of the Essex County Bar Association presented to this court for disciplinary action the conviction of the respondent on October 14, 1949, *United States v. Sacher,* 9 *F. R. D.* 394 (1949), for contemptuous conduct during the

course of the trial of 11 communist leaders in the United States District Court for the Southern District of New York, see *United States v. Foster,* affirmed on appeal *sub nom., United States v. Dennis,* 183 *F. 2d* 201 *(C. C. A.* 2 1950) ; 341 *U. S.* 494 (1951). On April 24, 1950, following the affirmance by the United States Court of Appeals for the Second Circuit of the respondent's conviction on all but one of the seven specifications with which he was charged, *United States v. Sacher,* 182 *F. 2d* 416 (1950), we issued an order to show cause returnable May 8, 1950. On the return date, because of an application then pending for a writ of *certiorari* to the United States Supreme Court, we continued without date argument on the order to show cause. On June 7, 1951, after the denial of review by the United States Supreme Court, *Sacher v. United States,* 341 *U. S.* 952 (1951), a new order to show cause was issued returnable June 18, 1951, and the matter was fully argued on the return day. Immediately thereafter and before the matter could be decided by us it was represented to us by the respondent that an application for reargument had been made to the United States Supreme Court. Accordingly, on June 25, 1951, we continued the rule to show cause until the application for reargument should have been disposed of, and pending such disposition suspended the respondent from the practice of law in this State. On January 3, 1952, the respondent was suspended for two years from the practice of law before the United States District Court for the Southern District of New York as the result of disciplinary proceedings prosecuted before that court by the Association of the Bar of the City of New York and the New York County Lawyers Association, *In re Sacher and Isserman* (not officially reported). On October 22, 1951, as a result of the petition for reargument, the United States Supreme Court vacated its previous order denying *certiorari* and granted a limited review, *Sacher v. United States,* 342 *U. S.* 858 (1951), and on March 10, 1952, it rendered its decision affirming the respondent's conviction, *Sacher v. United States,* 72 *S. Ct.* 451 (1952). Following this action

by the United States Supreme Court and in accordance with our order of June 25, 1951, our order to show cause was noticed for disposition on March 17, 1952. At that time counsel for the respondent presented to the court and opposing counsel an 11-page document entitled "Amended and Supplemental Answer" and copies of the opinion of the United States Supreme Court handed down on March 10, 1952. Notwithstanding the fact that the respondent had been given an opportunity to be heard before the Ethics Committee of the Essex County Bar Association on November 3, 1949, but had not availed himself of it, contenting himself with appearing by counsel who presented evidence, and notwithstanding that the matter was argued at length before this court on June 18, 1951, the respondent, through counsel, insisted on "an adequate opportunity to be heard and to present evidence on other matters in his defense on the issues before the court in this proceeding."

It is not necessary to recount here the precise nature of the respondent's contemptuous acts for which he has been convicted, for they are detailed in the opinion of the Court of Appeals affirming his conviction and are further commented on by the United States Supreme Court in its decision of March 10, 1952. Suffice it to say that Judge Harold R. Medina, before whom the case of *United States v. Foster* was tried and by whom the respondent was convicted, found that the conduct of the respondent and his associate defense counsel:

"* * * constituted a deliberate and willful attack upon the administration of justice, an attempt to sabotage the functioning of the federal judicial system, and misconduct of so grave a character as to make the mere imposition of fines a futile gesture and a wholly insufficient punishment."

He found, and Judge Augustus N. Hand of the Court of Appeals concurred in his finding, that they:

"* * * joined in a willful, deliberate, and concerted effort to delay and obstruct the trial * * * for the purpose of causing such

disorder and confusion as would prevent a verdict by a jury on the issues raised by the indictment; and for the purpose of bringing the Court and the entire Federal judicial system into general discredit and disrepute, by endeavoring to divert the attention of the Court and jury from the serious charge against their clients * * *."

Judge Jerome N. Frank of the Court of Appeals characterized the respondent's acts as:

"* * * outrageous conduct—conduct of a kind which no lawyer owes his client, which cannot ever be justified, and which was never employed by those advocates, for minorities or for the unpopular, whose courage has made lawyerdom proud. The acts of the lawyers for the defendants in this trial can make no sensible man proud."

Judge Charles E. Clark of the Court of Appeals, although he dissented from the affirmance of the respondent's contempt convictions for procedural reasons, labeled the conduct of the respondent and his associates as "abominable." Mr. Justice Jackson, speaking for the majority of the United States Supreme Court, which was concerned only with the procedural aspects of the respondent's conviction and not with the fact of his guilt, described the conduct of the respondent and his associate defense counsel as follows:

"The nature of the deportment was not such as merely to offend personal sensitivities of the judge, but it prejudiced the expeditious, orderly and dispassionate conduct of the trial. * * *

Their conduct has been condemned by every judge who has examined this record under a duty to review the facts. * * *"

Conduct of such a nature as to be punished by conviction for contempt and to be so characterized by the distinguished judges who have had occasion to review it most clearly constitutes a violation of the oaths which the respondent took as an attorney and counsellor of this State to "faithfully and honestly demean myself in the practice," *R. S.* 2:20–1, and of the Canons of Professional Ethics adopted by the American Bar Association, which by *Rule* 1:7–6 govern the conduct of the members of the bar of this State. Among the canons for which the respondent by his contemptuous conduct has shown utter disregard are Canon No. 1 providing that "It is

the duty of the lawyer to maintain towards the Courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance"; Canon 29 requiring a lawyer to "strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice"; and Canon 32 admonishing every lawyer against rendering "any service or advice involving disloyalty to the law whose ministers we are, or disrespect to the judicial office, which we are bound to uphold" and warning that such improper service or advice "invites and merits stern and just condemnation."

The respondent advances a variety of arguments as to why he should not be disbarred or otherwise disciplined. First, he contends that his conviction for contempt does not constitute grounds for disciplinary proceedings. He claims that the power to punish for contempt and the power to disbar are separate and distinct and that to ground disciplinary action upon a contempt of court is counter to the holding of the United States Supreme Court in the case of *Ex Parte James S. Robinson*, 19 *Wall.* 513 (1874), which has never been overruled. We recognize the difference between the power to punish for contempt and the power to discipline, but clearly the exercise of the one does not exclude the exercise of the other, nor do we consider that the cited case so holds. All that the court there held was that before an attorney is disbarred he is entitled to be heard, an opportunity which the respondent here was afforded both before the Ethics Committee in Essex County and before this court. In the more recent case of *In re Schofield,* 66 *A.* 2d 675 (*Pa.* 1949), the assertion was likewise made that the court could not discipline an attorney for misconduct at a trial for which he was subject to punishment for contempt. In answer to this argument the Supreme Court of Pennsylvania held:

"The fact that professional misconduct may also be a contempt does not bring disciplinary proceedings within the rule that one

court will not punish for contempt of another tribunal. The respondent is not now charged with contempt of court but with misbehavior in his office of attorney. * * * A contempt proceeding for misbehavior in court is designed to vindicate the authority of the court; on the other hand the object of a disciplinary proceeding is to deal with the fitness of the court's officer to continue in that office, to preserve and protect the court and the public from the official ministration of persons unfit or unworthy to hold such office." (*P.* 692)

While conviction for contempt may not always necessitate or justify disciplinary proceedings, we are of the opinion that conviction for contempt does not relieve us of our constitutional duty to take such disciplinary action as in the circumstances may be warranted.

■ Next, the respondent asserts that disciplinary action is not appropriate because the contemptuous conduct of which he has been convicted does not involve moral turpitude. We do not find it necessary, however, to decide whether or not the respondent's conduct involved moral turpitude, for the power to discipline is not limited to situations where an attorney has been convicted of a crime involving moral turpitude. The flagrant and intentional disregard for the proprieties of the courtroom exhibited by the respondent constitutes misconduct so closely related to and so potentially destructive of the due administration of justice as to warrant the severest discipline. A lawyer who has thus publicly demonstrated his utter contempt for one of the courts of this Nation, its judges, its rules and processes and, indeed, our entire judicial system, should not be permitted to continue to practice as an officer of the courts of this State.

The argument is advanced by the respondent that discipline is not called for because at the time of his contemptuous acts he was working under most trying circumstances and was merely doing his best to defend his clients and thus to fulfill his obligations to them. This contention is without merit. The suggestion is even made that he is to be admired and commended for the zeal and persistence with which he fought for his clients in an unpopular cause, rather than condemned and disciplined. To discipline an attorney in

these circumstances we are told is a dangerous thing. The same argument was made and the same fears expressed on the review of his conviction for contempt and it was rejected by both the Court of Appeals and by the United States Supreme Court. As pointed out by Judge Frank, no lawyer owes his client the duty of conducting his defense in such a manner; in fact such conduct is a disservice to the client:

"Preservation of the liberties of citizens, when on trial for crimes charged against them, demands order in the courtroom. Absent such order, no trial can be fair. More important, if criminal trials cannot go on in orderly fashion, then the defendants, if unpopular or if members of minority groups, may become the victims of that monstrous substitute for trials—mob violence."

Mr. Justice Jackson speaking for the majority of his court said:

"We are not unaware or unconcerned that persons identified with unpopular causes may find it difficult to enlist the counsel of their choice. But we think it must be ascribed to causes quite apart from fear of being held in contempt, for we think few effective lawyers would regard the tactics condemned here as either necessary or helpful to a successful defense. That such clients seem to have thought these tactics necessary is likely to contribute to the bar's reluctance to appear for them rather more than fear of contempt.

But that there may be no misunderstanding, we make clear that this Court, if its aid be needed, will unhesitatingly protect counsel in fearless, vigorous and effective performance of every duty pertaining to the office of the advocate on behalf of any person whatsoever. But it will not equate contempt with courage or insults with independence. It will also protect the processes of orderly trial, which is the supreme object of the lawyer's calling."

The Canons of Professional Ethics clearly recognize that the lawyer need not and should not go to such extremes of conduct as did the respondent. Canon No. 5 dealing with the defense of those accused of crime states that "the lawyer is bound by *all fair and honorable* means, to present every defense that the law of the land permits." The words we have emphasized indicate a distinct limitation on the lawyer's obligation to his client. Canon No. 15 entitled "How far a

lawyer may go in supporting a client's cause" contains this *caveat*: "But it is steadfastly to be borne in mind that the great trust of the lawyer is to be performed within and not without the bounds of the law." Neither does any client have the right to demand of his lawyer that he engage in improper practices, Canons No. 18 and 31, nor is any client or cause of such importance as to justify a lawyer in departing from his duty of being respectful both of the law and of those that administer it, Canon 32. We do not countenance any infringement on the lawyer's lawful obligation to his client or any restriction on his right to object to the conduct or rulings of the court, see *Roberts Electric, Inc., v. Foundations & Excavations, Inc.,* 5 *N. J.* 426, 431 (1950), but those obligations and rights must be exercised within the bounds of the rules established for the conduct of litigation and not by a flouting of those rules.

Furthermore the respondent contends that the degree of his misconduct cannot be determined without a review of the entire 15-volume record of the trial at which it took place and that he should now be afforded an opportunity of introducing that record in evidence in this proceeding and to present evidence and other matters in his defense and to be heard thereon. We cannot acquiesce in these requests. This disciplinary proceeding against the respondent was instituted two and one-half years ago and almost two years ago we issued our rule to show cause why he should not be disbarred or otherwise disciplined. He had his opportunity to be heard before the Ethics Committee and he availed himself of it to the extent of having his counsel offer certain evidence. At the argument before us on June 18, 1951, he made no request for a further hearing or for leave to present testimony. There is no occasion for us to look behind the respondent's conviction. His guilt of contempt has already been found and determined by a court of competent jurisdiction and his conviction affirmed on appeal by two courts. We must necessarily accept his conviction as a fact, and for purposes of imposing discipline consider only the result of

the criminal or *quasi*-criminal proceeding. It has always been so in this court. If, for example, a lawyer has been convicted of embezzlement we do not review the record of the criminal trial but impose discipline on the basis of the nature of the crime for which conviction has been had. There is no reason for it to be otherwise here.

 Finally, the respondent contends that we should give due regard to the fact that Judge Hincks of Connecticut, sitting by special assignment in the United States District Court for the Southern District of New York, after reviewing the disciplinary charges made there against the respondent limited punishment in that court to the suspension of the respondent from practice for two years. He urges that his suspension by order of our court since last June and his own voluntary cessation of practice here since the issuance of our first order to show cause in May, 1950, should be deemed part of his punishment and, having thus been punished for almost two years, he should now be permitted to resume practice here. We cannot accept this view of the situation, for we cannot escape the fact that New Jersey is primarily responsible for the respondent's conduct at the bar. He is not a member of the bar of any other state and he has been permitted to practice elsewhere solely by virtue of his admission to the bar here. The respondent must be judged by the standards of practice prevalent here. It is unthinkable that any one of the many incidents for which the respondent was convicted of contempt in New York could have occurred in New Jersey. The mutual respect that our bench and our bar have traditionally had for each other and their high regard for the administration of justice would have precluded any such conduct by an attorney here. We cannot recall any case in this State where counsel have attempted such a course of studied misconduct toward our courts nor are we aware of any such case in our judicial history. In fairness to the courts of other jurisdictions and out of a decent respect for the opinion of the people of this State, we cannot permit a lawyer admitted to practice in New Jersey to do in the

courtroom of another jurisdiction what he would never have been allowed to do here. To do so would bring into disrepute our bar, our bench and our entire judicial establishment. Furthermore, we are bound to take into consideration the respondent's previous record in this State. He was convicted of statutory rape in 1925 and on the report of the Board of Bar Examiners was suspended by the former Supreme Court from the practice of law for six months, *In re Isserman*, 6 *N. J. Misc.* 146 (1928). The controlling consideration in reaching a determination as to the measure of discipline, however, is respondent's scandalous and inexcusable behaviour in seeking to bring the administration of justice into disrepute in a trial that lasted nine months.

The name of the respondent will be stricken from the rolls.

*For disbarment*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD and BURLING—5.

*Opposed*—None.