In re SACHER et al.

ASSOCIATION OF THE BAR OF CITY OF NEW YORK v. SACHER.

No. 183, Docket No. 22302.

United States Court of Appeals Second Circuit.

Argued March 9, 1953.

Decided July 6, 1953.

Rehearing Denied Aug. 20, 1953.

F. W. H. Adams, New York City (William C. Scott and Philip C. Smith, New York City, of counsel), for petitioners-appellees.

Harry Sacher, pro se, and Telford Taylor, New York City, for respondent-appellant.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from an order disbarring the respondent for professional misconduct while the jury was being selected and during the course of the trial of the communist leaders, who had been indicted under the "Smith Act," 18 U.S.C.A. § 2385, for advocating the overthrow of the government of the United States by force and violence, United States v. Dennis, 2 Cir., 183 F.2d 201, affirmed 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137. The present proceeding was commenced by the service of an order to show cause issued upon a petition by the Association of the Bar of the City of New York and the New York County Lawyers' Association. On the trial before the District Court sitting without a jury the only evidence introduced was the record of the trial and the preliminary proceedings in the Dennis case—the respondent offered no testimony on his behalf. In a carefully considered opinion Judge Hincks held that the instances of misconduct shown by this record required Sacher's disbarment, although the judge stated: "I find in the entire record no intimation that his conduct was tainted by venality or lack of fidelity to the interests of his clients,—offenses which demonstrate a moral turpitude wholly absent here. His fault, rather, seems to have stemmed from a temperament which led to such excess of zeal in representing his clients that it obscured his recognition of responsibility as an officer of the court. Thus the very qualities which in my judgment make him professionally unfit to remain a member of this Bar might well be unobjectionable in commercial fields where competitive effort is not subject to the restraints required of an officer of the Court. For instance, in negotiations * * * I should expect that he would be a trustworthy and highly effective representative. * * *"

Paragraph 15 of the petition of the Bar Associations charged 36 instances of improper conduct, of which the court held 28 had been proved, requiring disbarment. Two of the specifications were discussed in detail by the District Court as evidencing particularly serious misconduct and have been emphasized on this appeal by the respondent as influencing the discipline imposed. One related to the continuation of a cross-examination by Sacher which the court permitted under what the respondent knew to be a misapprehension of facts which he failed to correct. The charge was held not to have been sufficiently established in the contempt proceedings against the respondent, see U. S. v. Sacher, 2 Cir., 182 F.2d 416, 424-425, and he argues that therefore it cannot be said to have been sufficiently proved here. But in this proceeding, as the judge below pointed out, Sacher did not deny the allegation that he knew of the judge's misapprehension, and did not seek to avail himself of his opportunity to testify. Although the burden of proof is on the petitioners, the accused attorney owed the court the greatest frankness in a proceeding such as this. Cf. Matter of Randel, 158 N.Y. 216, 221, 52 N.E. 1106. We are not impressed by Sacher's argument that he did not have to deny this allegation since it was a conclu-

sion of law, and we agree with the court below that his failure to correct the trial judge's misapprehension was a violation of his professional duty.

The second instance that was stressed by Judge Hincks was the respondent's remark: "They [the early Christians] did so many things, more than this evidence disclosed, that if Mr. McGohey were a contemporary of Jesus he would have had Jesus in the dock." Even if this remark was not quite such a serious breach of professional ethics as Judge Hincks thought (see Canon 17 of the American Bar Association's Canons of Professional Ethics), since the intended import may have been only that if the United States Attorney prosecuted secret groups now the same logic would have required him to have done so had he lived when Jesus did, it was capable of misapprehension. When its purpose and effect were evidently misunderstood as an attack upon the opposing counsel's religion, Sacher clearly should not have refused to apologize or explain.

In any event disbarment was decreed on other independent grounds which we believe fully justified the order. Two types of conduct alleged in Paragraph 16 of the Bar Associations' petition were each held to require that the respondent be no longer allowed to practice before the court. This paragraph charged that Sacher "persistently, in disregard of the repeated warnings and orders of the Court, argued without permission; [and] refused to desist from argument and comment" and that he made "insolent, sarcastic, impertinent and disrespectful remarks to the Court and conducted himself in a provocative manner." For a few examples of respondent's conduct see our opinion in United States v. Sacher, 2 Cir., 182 F.2d 416, at pages 423–24, affirmed 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717. The court further found that, although the charge in Paragraph 14 of the petition that a conspiracy had existed with other counsel representing other defendants to obtain specified improper objectives by improper trial conduct was not established, treating the allegations of a conspiracy as surplusage the proof of individual misconduct alleged in Paragraph 14 required disbarment. These charges were of substantially the same nature as those for which disbarment was ordered under Paragraph 16.

Basically the respondent's argument is that in view of his previous unblemished record disbarment is too severe a discipline to impose for conduct in part brought on by the demands of an unusual and important trial which took place in an atmosphere of hostility toward the defendants. He further maintains that instances of properly conducting himself subsequent to the Dennis trial established that the court's finding that his recalcitrance is congenital, so that similar misbehavior could be expected in the future, was clearly erroneous. The extraordinary nature of the trial was considered by the district court, and we agree that it provided no excuse for the many instances of misconduct of which the respondent was guilty. We think that it was incumbent on him not to have impeded the trial's progress in the ways that he evidently sought to do. Nor did the judge err in anticipating a repetition of such tactics if the respondent felt that they would be to his advantage, for he persisted over an extended period in his defiant and disorderly ways in the face of repeated warnings by the court.

The purpose of striking an attorney from the rolls of a court is not to punish him but to protect the court itself and relieve the public of a member of the legal profession, who is unfit to serve as such, in order to maintain the respect due the court by insuring that attorneys, who are "officers of the court," are of good professional character. See Matter of Rouss, 221 N.Y. 81, 85, 116 N.E. 782. Because the consequences of disbarment are necessarily severe, it is a measure to be exercised only for compelling reasons. See Ex parte Wall, 107 U.S. 265, 288, 2 S.Ct. 569, 27 L.Ed. 552. In the case at bar we think that the proved instances of unprofessional conduct, constantly repeated in the face of the court's admonitions, and continuing during a trial of extended duration, clearly demonstrated a lack of respect for the court and constituted a serious obstruction to the administration of justice. It is evi-

dent that the respondent either was unable to comprehend his obligations to a court of law or was unwilling to fulfill them when he felt it inexpedient to do so. Even if a less severe measure of discipline might have been imposed, we do not find any abuse of discretion in disbarring the respondent from practice such as was found to exist in In re Doe, 2 Cir., 95 F.2d 386. See In re Chopak, 2 Cir., 160 F.2d 886, 887, certiorari denied 331 U.S. 835, 67 S.Ct. 1516, 91 L.Ed. 1848.

Order affirmed.

CLARK, Circuit Judge (dissenting).

In a proceeding against another lawyer caught in this same legal tangle, four justices of the Supreme Court, after pointing out that the charge by the judge in the Dennis trial of a deliberate conspiracy to obstruct justice was found to lack support in the evidence both in the contempt case and in this present disciplinary proceeding, said: "What remains is a finding that he was guilty of several unplanned contumacious outbursts during a long and bitter trial." They continued: "Perhaps consciousness of our own short patience makes us unduly considerate of the failing tempers of others of our contentious craft. But to permanently and wholly deprive one of his profession at Isserman's time of life, and after he has paid so dearly for his fault, impresses us as a severity which will serve no useful purpose for the bar, the court or the delinquent." In re Isserman, 345 U.S. 286, 294, 73 S.Ct. 676, 680.

Four other justices rested their contrary decision on the procedural rule of the Court requiring that a member of its bar who has been disbarred from practice in any state should be disbarred before it unless he showed good cause to the contrary. That rule operated by reason of Isserman's disbarment by the highest court of New Jersey to put a burden upon him which he had not met. Since the justices were equally divided (one justice not sitting), the operation of this burden against him led to his disbarment by the narrowest of all possible margins. Here there are several significant differences favorable to this respondent, which I should think render this an *a*

*fortiori* case for reversing the harsh doom visited upon him below.

First, no procedural rule here operated against respondent; on the contrary, there is a definite one in his favor. For as the majority opinion herewith correctly points out, the burden of proof was definitely on the petitioning associations. Second, there are the differing situations out of which these procedural rules stem. As the Supreme Court points out, it will follow a state court ruling of disbarment "in the absence of some grave reason to the contrary." 345 U.S. at page 288, 73 S.Ct. at page 677. Under such circumstances disbarment in the district court below would be automatic. General Rule 5(b) of the United States District Courts for the Southern and Eastern Districts of New York. Considerations of convenience, of fairness to litigants, and of the dignity of the federal courts support such comity. But here the courts of New York have not spoken. Since state proceedings would go immediately before the bench of the First Department, Appellate Division, N.Y. Judiciary Law, McK.Consol.Laws, c. 30, § 90, subd. 2, we here lack the conviction which action pro or con by that distinguished tribunal would afford us. Perhaps the state courts are waiting on our decision; but that only makes our responsibility the heavier.

Finally, two further considerations suggest important differences on the record in the case histories of the respective counsel. Respondent here had 24 years of unblemished professional conduct in the state and federal courts before his entry on the famous trial. On the other hand, Isserman had been previously convicted of a crime and suspended for a time from practice. In the Supreme Court there was dispute as to how much weight should be accorded these facts; the warmth of the dispute suggests, however, that they did assume considerable importance. Further, on the crucial question of conduct in the four years subsequent to the trial, the justices apparently had little information on Isserman; the dissent does speak well of such personal appearances as he had previously made before them. But as to Sacher we

have all this and substantially more. In addition to appearing in his own behalf, this respondent has appeared below and before us in cases of some difficulty where not only has his conduct been uniformly courteous and dignified, but his professional ability of unusually high order, as we have pointed out. United States v. Hall, 2 Cir., 198 F.2d 726, 727, 730, certiorari denied 345 U.S. 905, 73 S.Ct. 644, on appeal from D.C.S.D.N.Y., 101 F.Supp. 666, where the record showed commendation also by the district judge; U. S. ex rel. Nukk v. District Director of Immigration and Naturalization, 2 Cir., 205 F.2d 242. Were we to select a public defender, we could hardly do better than seek respondent's services in cases of this type where it is difficult to secure able representation and will undoubtedly become more so in consequence of decisions such as this.

Indeed, everyone seems to concede, though an argument against respondent is made on the very concession, that respondent, a lawyer of ability, knows how to conduct himself in his profession and can do so if he feels the need. The fear is expressed that such conduct cannot "safely" be relied upon; but since we do not have here the remotest intimation of danger to clients by defrauding or otherwise, this must be a fear that district judges hereafter cannot control their courtrooms with respondent present. For my part I repudiate this idea. It seems to me that respondent, after his searing experience, including a severe sentence of imprisonment, gives good earnest of proper professional conduct, and that our judges are quite capable—if need there be—of exercising the proper degree of firmness and dignity necessary for the fitting conduct of judicial business.

This, therefore, seems to me a quite unnecessary and ill-fitting example of judicial harshness which apparently does trouble my brothers, judging from the sense of apology with which the sentence is affirmed. I cannot believe that this can stand as the final action of the courts in the premises, or that an application for reinstatement will not meet with more favor when the present

atmosphere of hysteria has somewhat abated.

Having thus briefly discussed the particular fate of this respondent, perhaps I should stop here. But since I feel most deeply that involved are more than the vicissitudes of one individual, even the honor and reputation of the federal courts for sober impartiality, a fuller analysis of the legal basis for this decision seems impelled. Before I turn to the facts, I must raise two important questions of law as to which I think the majority holding is erroneous. The first is in treating this case as one primarily within the discretion of the district court. And the second is in disposing of this important question, touching as it does the integrity of the court, by a panel, and not the full court.

Treating the last matter first, on the appearance of Western Pac. R. Corp. v. Western Pac. R. Co., 345 U.S. 247, 260, 274, 73 S.Ct. 656, with at least an implication of criticism of our practice of never sitting *en banc,* it seemed to me that an issue appropriate to be disposed of by the full bench was here presented. Accordingly I asked the Chief Judge to poll the court, which he did; of the active judges available to sit in this case, three voted against sitting *en banc* and two for it. Consequently my request was not given effect; and decision here, involving, as I believe, errors of law and of fact, is by only a minority of the court. That I believe is not right.

Now considering the responsibility of this court on appeal, I do not wish to convey any criticism of Judge Hincks, who sat in this case as a designated visiting judge and who acted with dignity and devotion. But these very circumstances seem to point the more to the ultimate responsibility which should be ours and the wisdom of the New York law, cited above, requiring the proceedings to go at once to the appellate court. The difficulties of Judge Hincks' position, called upon as a visitor to weigh in considerable part the criticized actions of a fellow, albeit local, judge, are obvious. He never should have been placed in such a position. His concern is clear;

it led him to what I believe may be termed a leaning over backwards in both directions to make markedly favorable fact findings for respondent and then like legal conclusions for the petitioners and thus for his brother judge and court. For so we have the result—surely anomalous and not duplicated elsewhere in the precedents—of absolute disbarment of a lawyer whose conduct has no taint of "venality or lack of fidelity to the interests of his clients," but only an "excess of zeal in representing his clients" or qualities "unobjectionable in commercial fields" or making him in negotiations "a trustworthy and highly effective representative." There must be something topsy-turvy when in "our contentious craft"—to use the Supreme Court's apt expression—a lawyer loses his profession permanently for displaying those very qualities most often associated with it. I do not believe that can be the law.

For the law, I believe, is rather clear. The fundamental principle is aptly stated in Bradley v. Fisher, 13 Wall. 335, 80 U.S. 335, 355, 20 L.Ed. 646, thus: "A removal from the Bar should, therefore, never be decreed where any punishment less severe—such as reprimand, temporary suspension, or fine—would accomplish the end desired." So we have implicitly recognized that open, and hence controllable, misconduct at a trial where no venality was involved would not warrant disbarment when we said in In re Doe, 2 Cir., 95 F.2d 386, 387: "Disbarment is fitting only when the attorney has been guilty of corrupt conduct; of some attempt to suborn a witness, or to bribe a juror, or to forge a document, or to embezzle clients' property, or other things abhorrent to honest and fair dealing." These are upper court rulings; the appellate courts seem without question to accept the responsibility which should be theirs and to reverse freely where the penalty of disbarment is considered too severe. See also In re Patterson, 9 Cir., 176 F.2d 966; Bartos v. United States District Court for Dist. of Nebraska, 8 Cir.,

19 F.2d 722; In re Fisher, 7 Cir., 179 F.2d 361, certiorari denied Kerner v. Fisher, 340 U.S. 825, 71 S.Ct. 59, 95 L.Ed. 606. Here is no question of evaluating the credibility of witnesses; in fact everything turns upon the printed transcript of the Dennis trial, with which we have a familiarity by repeated exposure somewhat more extensive than had the visiting trial judge. And so if the penalty is too severe here, it is our legal duty and responsibility to take action to correct it.

Thus I come once more to the occurrences at the Dennis trial and their bearing upon the judicial process operating through the medium of Anglo-Saxon procedure. When that trial was planned, it seemed that it might well afford a demonstration, of world-wide interest, of the capacity of American courts to show evenhanded justice to all litigants even under the difficult circumstances of a mass trial involving matters of opinion. At its conclusion, although its course had been marred by certain boisterous incidents, it seemed that considerable satisfaction was possible with an outcome reached under the peculiar difficulties present. But that assurance was soon dispelled when the trial judge took the unprecedented course of summarily sentencing the defense lawyers, without trial or hearing, to substantial terms of imprisonment for their conduct during the trial and for a conspiracy to obstruct justice which he concluded existed. This overshadowed at once all the fine and persistent efforts of the prosecution in preparing and conducting so hard a case. But more, it raised the insistent question whether the judge's action did not appear more of a vindictive than a judicial nature. Nevertheless he was sustained by divided judicial votes on most of his substantive charges, the conspiracy charge falling. But whatever the strict legal merit of these decisions, they held far more immediate popular appeal than sober professional approval; and the doubts which have permeated the scholarly legal field [1] suggest

1. For critical comments, see 2 Buffalo L. Rev. 153; 37 Corn.L.Q. 795; 66 Harv.L. Rev. 170; 12 Law.Guild Rev. 39; 36 Minn. L.Rev. 965; 31 Ore.L.Rev. 80; 24 So. Calif.L.Rev. 112; 2 Stan.L.Rev. 763; 99 U. of Pa.L.Rev. 540; 6 Vand.L.Rev. 120; 62 Yale L.J. 509, 510; Frank, United States Supreme Court: 1951-52,

the unwisdom for other judges to try so summary a.course.

Hence even were there nothing more in the record to soften an otherwise deserved condemnation of the lawyers' conduct, I should still feel a judgement of disbarment should not stand. As already stated, this decision depends absolutely on the record made in the contempt case; nothing new has been brought out against the respondent and nothing elsewhere has been allowed to operate in his favor. Even at the time of the judgment of contempt, the fiery occurrences at the trial were receding into the past. Of the 22 incidents charged against this respondent (in addition to the general charge of conspiracy) 6 occurred before the jury trial started; and the disturbances appear to have lessened as the trial went forward, the last one cited being a month before the close of the trial.[2] To rekindle the heat of courtroom altercations some years after to justify permanent disbarment is itself a somewhat dubious practice; but I suggest that the unconvincing character of the incidents picked out for stress below and here points to the general undesirability of so extensive a retribution for this type of conduct.

The first of the two instances noted by the majority is respondent's cross-examination of a witness as to pleas of guilt to criminal charges in order to impeach his credibility. In the contempt proceedings we held unproven the charge that respondent continued the cross-examination when it was permitted by the court under what he knew to be a misapprehension of the facts which he failed to correct. United States v. Sacher, 2 Cir., 182 F.2d 416, 424-425, affirmed Sacher v. United States, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717. But curiously that unproven charge is now brought back and used against respondent on a theory of implied admission by failure to indulge in some formal pleading denial. This seems to me to be building an artificial case on so formal and technical a ground as to be really distressing. It is perfectly obvious that this proceeding rests wholly on the contempt charges and order entered against respondent by the original trial judge and that the present action would never have been brought without them. To say then that such of the contempt charges as have been eliminated by careful and formal appellate adjudication must again be separately denied so as not to avail the petitioners here is to employ the most regressive and questionable form of procedural technicality to destroy a man's livelihood. The merits of this particular charge are not now re-examined by the majority; so far as they appear available to us, our previous decision seems more in accord with the facts than our present one.[3]

The other incident which affected the judge below more than my brethren here was respondent's remark that if the United States Attorney "were a contemporary of Jesus he would have had Jesus in the dock." This seems to have been first stressed as

---

20 U. of Chi.L.Rev. 1, 43-47; Harper and Haber, Lawyer Troubles in Political Trials, 60 Yale L.J. 1; and see also Whitty, 14 Mod.L.Rev. 89, and Stubbs, 30 Can.B.Rev. 643. For exculpatory comments see 38 A.B.A.J. 594; 7 The Record 192, 206; [1952] U.Ill.L.Forum 300; 36 Va.L.Rev. 957.

2. See United States v. Sacher, 2 Cir., 182 F.2d 416, 431, 464, note 1, 465, note 4. There seems to have been a drying up of untoward incidents by the defendants after the judge exercised firmness toward the lay accused in June after 2½ months of trial. Of course there will always remain the question whether firmness toward counsel, exercised at an early date, even before the jury trial

started, would not have solved many problems. It has been urged that the trial judge was wise in avoiding the chance of mistrial by refraining from earlier action. But, as a justification for later retributive action, this seems wholly irrelevant; the case had gone to a conclusion, and speculation on what might otherwise have happened cannot affect that outcome. See 182 F.2d at page 465, 343 U.S. at page 21, 72 S.Ct. 451.

3. It appeared that the witness had withdrawn pleas of guilt to the charge of carrying concealed weapons, to receive later acquittals; respondent's contention is that he wanted to show the witness' appearance and testimony induced by promises of such reward.

antireligious in tone. Obviously it is not. It is rather an example of the not uncommon practice of citing historical allusions to reflect upon the merits of the charges being litigated; that this allusion took a somewhat provocative form indicates only a possibly ill-advised attempt at emphasis.[4] Considering the prosecutor's reaction, an apology later would have tended to greater brotherly accord among counsel. But to make its lack a basis for disbarment seems to me an incredibly unreal approach to the realities of criminal trials in this country. Certainly one whose business in life is to scan trial records can hardly display a shock of surprise at this comparatively trivial incident compared to what occurs in many a trial without later reprisals.[5]

Beyond all this, however, there still remains a consideration suggesting amelioration of penalty, to which I must advert—touching as it does the honor and prestige of the court—no matter how much I personally should like to avoid doing so. It is now well known that there has been criticism in the highest circles of the judicial conduct of the Dennis case on the ground that the judge himself engaged in the altercations with counsel and even to a certain extent promoted them. 343 U.S. 14–89, 72 S.Ct. 451.[6] I do not want to recount the details which I had hoped could soon be forgotten; and I can find sympathy for the elements of provocation apparent.[7] But as the judge is held to have accepted the provocation at the time, so by that much he and those who agree with him are behooved to tolerate some reciprocal lack of restraint from the attorneys and refrain from continued retributive actions against them. We do not need even to formulate or express criticisms of the human mortals who participated in this drama to feel that the circumstances now make most undesirable so sharp a judgment as this. For our courts should be, like Caesar's wife, above suspicion; in my judgment they are strong enough by virtue of a solidly achieved reputation for fairness, poise, and impartiality to afford avoidance of any appearance of vindictiveness or prejudice. The events of the Dennis trial touched the judge so closely, as the authorities just cited show, that retribution initially started at his hands can only appear to many to be vindictive, and later affirmations timorous and protective. I do not believe our courts should give occasion for so nearly merited a shadow on their good repute. Under the circumstances a grant of mercy here would show the courts great in tolerance and human understanding, and consequently in strength; but they stand to gain nothing, certainly with the discriminating, beyond a sacrifice of confidence, if they allow vindictive harshness to control their actions.

**4.** See the comment of Professor Countryman of Yale University, 174 The Nation 641, June 28, 1952: "Thirty-two years ago, in another Communist prosecution, Clarence Darrow charged that the prosecutor 'would have sent Christ to jail just the same as you would these defendants.' In the comparative calm of the 1920 Red hunt no one thought of disbarring Darrow or holding him in contempt. And the bar weathered many more years of his zealous arguments for the defense."

**5.** As the opinion points out, of 36 instances of specific acts of alleged misconduct in the Dennis record, the district court found 28 supported. It is difficult to see how the 8 he found not proven differed materially in nature, intent, or consequence from those supported; the nuances of differentiation relied on suggest the somewhat ephemeral nature of the changing human conduct under stress here so drastically penalized.

**6.** See also 60 Yale L.J. 1 and other citations in note 1 supra.

**7.** Moreover, I certainly have no wish to defend the conduct of the attorneys; nor have I ever. Thus in what I hoped was a careful choice of words I said: "To one schooled in Anglo-Saxon traditions of legal decorum, the resistance pressed by these appellants on various occasions to the rulings of the trial judge necessarily appears abominable." 182 F.2d at page 463. This limitation of judgment to the one series of incidents arising out of trial rulings was not an over-all characterization of the appellants as members of the bar, as apparently assumed, cf. In re Isserman, 9 N.J. 269, 87 A.2d 903, 904; the procedural occasion for the altercations is a necessary and important element to be recalled when the issue is as to the weight of the punishment to be inflicted.

In short, why must the most serious wounds to justice be self-inflicted?

I would reverse.

On Petition for Rehearing.

PER CURIAM.

Petition for rehearing is denied.

CLARK, Circuit Judge (dissenting).

While I desire to record my view that appellant's points of law in criticism of the opinion of this court heretofore entered in this case are well taken and that the petition ought to be heard *en banc,* yet I shall not ask for a separate vote of all the judges on this petition. I do think we are not complying with the requirements for *en banc* hearings stated in Western Pac. R. Corp. v. Western Pac. R. Co., 345 U.S. 247, 73 S.Ct. 656; but the point is sufficiently made on the record for purposes of review, and a vote by only the three judges now active and available to participate[1] would doubtless be no more convincing than decision by a minority of the court. The interest of expeditious review suggests that no further delay be had in this court. Judge FRANK authorizes me to say that he concurs in my views that the issue ought to be heard *en banc,* but that no further steps should be taken here in view of the state of the record and we can properly await and hope for instructions by the Supreme Court as to the procedure we ought to follow.

1. Two judges having meanwhile retired.