## IN THE MATTER OF WILLIAM GREENBERG, AN ATTORNEY-AT-LAW.

Argued November 7, 1955—Decided March 21, 1956.

*Mr. Raymond G. Betsch,* by direction of the court, argued for the order to show cause.

*Mr. Fredrick J. Wallzinger* argued in opposition to the order to show cause (*Mr. Leon W. Kapp,* attorney; *Mr. Herman W. Kapp,* on the brief).

The opinion of the court was delivered by

JACOBS, J. The respondent William Greenberg, an attorney-at-law, is charged with conduct violating the canons of professional ethics. Testimony was taken before the Bergen County Ethics and Grievance Committee and the respondent was duly heard.

In May 1954 Richard S. Warren, a long distance truck driver, and Harry English, a production tester for Air Associates, wanted to purchase a truck and enter into a trucking business venture. They had no money and were apparently unable to borrow from a bank or other reputable lending institution. They answered a newspaper advertisement which led them to Hyman Greenstein, a retired businessman of Englewood. Mr. Greenstein testified that Messrs. Warren and English, together with Mrs. Ruth English, the mother of Harry English, visited him during May 1954, asked for a loan of $2,500, and Mrs. English stated she could offer, as security, certain marketable stocks plus a third mortgage on her home. Mr. Greenstein testified further that he told them that he would have to charge a bonus; that he could not do that unless they had a corporation to which he could make the loan; and that he recommended the respondent, who had acted as his attorney in previous matters, for the legal work incident to the formation of the corporation and the consummation of the loan. Mary E. Cesareo, the respondent's secretary, testified that on May 24, 1954 Messrs. Warren and English, Mrs. English and Mr. Warren's wife, came to the respondent's office, together with Mr. Greenstein; that she overheard Mr. Greenstein and Mrs. English discussing "the corporation that they were going to have"; and that Mrs. English "was thanking Mr. Greenstein for suggesting they make the corporation and Mr. Greenstein replied to her since they were going to have the corporation he thought it best she become an officer."

The respondent testified that when he returned to his office from lunch on May 24, 1954 he conferred with Messrs. Warren and English, Mrs. English, Mrs. Warren and Mr. Greenstein; that Mr. Greenstein explained that he intended to make a loan to "these people" and that he suggested "they have a corporation and they were agreeable to the same." Apparently the loan was then to be $2,900 plus a bonus of approximately $600, with Mrs. English's stocks and third mortgage as security. The respondent

checked the stocks and found them to have a marketable value of $2,000. He told Mrs. English that his legal fees would approximate $600 and he gave her the following "breakdown" as he expressed it: "I told her the corporation fee would be $250; that the deed from English to the corporation would be $25 and the deed from the corporation to English was to be $25 and there were two deeds to record— $11.30; that the search on the property would cost $200 and the agreement with Mrs. English for the collateral would be $35 and that they would have to pay the transfer of the stock."

Subsequent to the conference of May 24, 1954 the amount of the loan from Mr. Greenstein (or his nominee) was increased to $3,500 plus a bonus of $1,000 and the loan was actually consummated on June 7, 1954. The corporation was formed, title to the English home was conveyed to the corporation which then executed a third mortgage to Mr. Greenstein, and the property was then reconveyed to Mr. and Mrs. English. Mrs. English's stocks were turned over to Mr. Greenstein, as security, as was the corporate stock of the newly formed corporation. The respondent's actual charges for legal services and related disbursements aggregated $647.05 and the net amount which the borrower received may therefore be said to have been $2,852.95; on the other hand the borrower's obligation, on its face, was for $4,500 with legal interest, secured by the corporate stock, a third mortgage on the English home, and the marketable stocks of Mrs. English which were then worth $2,000 but have since increased in value.

It is undisputed that throughout the transaction the borrowing interests received no independent legal advice. Mrs. English testified she assumed that the respondent "was working for the good of everybody." Mr. Warren testified that the respondent had said that "as long as he was handling the case and handling Mr. Greenstein's interest" that he might as well handle their interest and "handle everything to do with the trucking business." Mr. Harry English testified that it was understood that the respondent would

represent the newly formed corporation. The respondent testified that he represented the lender and not the borrower; he acknowledged that he did not at any time suggest to the borrowing interests that independent legal advice be obtained. At one point he testified that he did not think Mrs. English, who had been a housekeeper and whose husband was a maintenance man, "knew what it was all about" but he did not advise her as to what she was getting into because he "had no obligation to explain it to her." In response to an inquiry as to why "Mrs. English would be thanking Mr. Greenstein for suggesting the corporation" the respondent replied that Mr. Greenstein was a pretty good salesman and had probably convinced her that "it was the best thing in the world for her." The respondent admitted that he never explained anything to Mrs. English about the legality or illegality of bonus payments and did not suggest to her that she could perhaps obtain a direct loan upon the security of her marketable stocks valued at $2,000.

The respondent expressly denied that he ever advised Messrs. Warren and English that they would have to form a corporation; he stated that Mr. Greenstein had told him that he agreed to make the loan "providing a corporation was created." Mr. Warren testified that both the respondent and Mr. Greenstein told him that incorporating was the only way there could be a bonus legally. Mr. English did not recall whether it was Mr. Greenstein or the respondent who said they "would have to be incorporated." Mrs. English testified that although she was uncertain about the matter she did understand the respondent to say that "it would have to be incorporated" and that Mr. Greenstein had said "I want this done to protect you." The respondent denied that this latter remark was made in his presence. Mr. Greenstein testified that long before he ever met the respondent he knew that a corporation could not plead the defense of usury and he described earlier transactions in which corporations owned or controlled by him had paid bonuses to obtain loans. In response to an inquiry as to whether he or the respondent had suggested the formation of

the corporation Mr. Greenstein said that he definitely told the respondent the incidents of the transaction including the formation of the corporation and the payment by the borrower of "all the legal expenses."

After the loan transaction had been consummated and the new trucking venture had been operated for several months Messrs. Warren and English found themselves under financial stress and they requested Mr. Greenstein to reduce the monthly payments due on the loan. Mr. Greenstein agreed and instructed the respondent to prepare the necessary modification agreements. The respondent submitted a charge for legal services rendered in this connection in the sum of $108.50 and this was questioned by Mr. English. Thereafter the respondent, as attorney for Mr. Greenstein, wrote to the corporation (Warren & English Trucking Co., Inc.) requesting that past due payments on the loan be made prior to January 4, 1955. Messrs. Warren and English visited the respondent's office on January 4, 1955 and during their visit they asked for the modifying agreements. The respondent testified that he would not let them have them because he had not been paid and, in any event, Mr. Greenstein had not signed them. There were cross words, the respondent used some profanity for which he has since apologized, and he ordered them out of his office. Thereafter a complaint was made by Messrs. Warren and English to the Bergen County Ethics and Grievance Committee, charging the respondent with unprofessional conduct in that (1) he conspired "to avoid the usury laws," (2) charged "excessive prices" for legal services which were unnecessary, and (3) "represented two parties to a transaction with conflicting interests." After the conclusion of its hearings, the Ethics Committee found that (1) the respondent had conspired with Mr. Greenstein to evade the usury law, (2) he had testified falsely when he denied "that he had suggested the complainants incorporate," (3) he had placed himself in an inconsistent position in that on one hand he was representing Mr. Greenstein and on the other hand was attempting to represent the complainants and Mrs.

English, knowing that their interests were antagonistic to those of Mr. Greenstein, (4) he was derelict in the duty that he owed Mrs. English, and (5) he conducted himself "with a coarseness of language and expression unbecoming the members of a dignified profession." The Ethics Committee submitted a formal "Presentment and Findings of Fact" which embodied the foregoing charges and, on the basis thereof, this court issued an order to show cause why the respondent should not be disbarred or otherwise disciplined. Briefs have been filed by the Ethics Committee and the respondent and counsel appearing on their behalf have argued the matter fully.

Although the common law did not prohibit usurious exactions our statutes have done so since 1738. See *Allinson, Acts of the General Assembly of the Province of New Jersey* 110 (1776); *Grossman v. Calonia Land and Imp. Co.*, 103 *N. J. L.* 98 (*E. & A.* 1926). *Cf. Note, The Penalty for Usury in New Jersey*, 6 *Rutgers L. Rev.* 568 (1952). The present enactment (*R. S.* 31:1–1) prohibits generally the charging of interest exceeding six per cent and it is clear that it is unlawful to take a bonus beyond legal interest from an individual borrower. See *Leipziger v. Van Saun*, 64 *N. J. Eq.* 37 (*Ch.* 1902). *Cf. State v. Martin*, 77 *N. J. L.* 652 (*E. & A.* 1909). In 1902 the Legislature passed an act which declared that thereafter no corporation would be permitted to plead or set up "the defense of usury to any action brought against it to recover damages or enforce a remedy on any obligation executed" by it. See *L.* 1902, *c.* 144, *p.* 459. This act (now embodied in *R. S.* 31:1–6) is comparable to enactments in other states; they have given rise to much litigation dealing with circumventions of the policy against usury through use of the corporate device. See *Gelber v. Kugel's Tavern, Inc.*, 10 *N. J.* 191 (1952); *Corradini v. V. & M. Holding Corp.*, 34 *N. J. Super.* 427 (*Ch. Div.* 1955); *Jenkins v. Moyse*, 254 *N. Y.* 319, 172 *N. E.* 521 (1930); *Note, Usury Inc.—Incorporation to Avoid Usury Laws*, 7 *Miami L. Q.* 375 (1953); 30 *St. John's L. Rev.* 126 (1955); 38 *Conn. L. Q.* 93 (1952);

*Carozza v. Federal Finance & Credit Co.,* 149 *Md.* 223, 131 *A.* 332, 43 *A. L. R.* 18 (1926) ; 74 *A. L. R.* 209 (1931). *Cf. Collins and Ham, The Usury Law of Arkansas*: *A Study in Evasion,* 8 *Ark. L. Rev.* 399 (1954).

In some jurisdictions, including our neighboring State of New York, the courts have suggested that since the statutes prohibiting corporations from asserting usury as a defense were restorative of the common law they should be liberally applied. See *Curtis v. Leavitt,* 15 *N. Y.* 9, 154 (1857) ; *Butterworth v. O'Brien,* 23 *N. Y.* 275 (1861) ; *Brierley v. Commercial Credit Co.,* 43 *F.* 2d 724 (*D. C. D. Pa.* 1929), affirmed 43 *F.* 2d 730 (3 *Cir.* 1930), *certiorari* denied 282 *U. S.* 897, 51 *S. Ct.* 182, 75 *L. Ed.* 790 (1931) ; *Alston v. American Mortg. Co.,* 116 *Ohio St.* 643, 157 *N. E.* 374 (1927) ; *Straus v. Elless Co.,* 245 *Mich.* 558, 222 *N. W.* 752 (1929). However, our own courts have taken a contrary position and have tended to restrict the application of the statutory provision in order that sympathetic sweep might be given to the State's policy against usury. See *Pick v. Brand, Inc.,* 135 *N. J. L.* 526 (*Sup. Ct.* 1947) ; *Mazarin v. Hudson County R. E. & B. Co.,* 80 *N. J. L.* 35 (*Sup. Ct.* 1910) ; *Seacoast Real Estate Co. v. American Timber Co.,* 89 *N. J. Eq.* 293 (*Ch.* 1918), reversed on other grounds, 92 *N. J. Eq.* 219 (*E. & A.* 1920). *Cf. Fine v. H. Klein, Inc.,* 10 *N. J. Super.* 295 (*Cty. Ct.* 1950). In *Gelber v. Kugel's Tavern, Inc., supra,* this court recently served notice that use of the corporate shell to cloak a loan which was actually being made to an individual borrower would in nowise be permitted to defeat the usury laws of our State.

The evidence in the instant matter discloses that the transaction between Mr. Greenstein on the one hand and Messrs. Warren and English and Mrs. English on the other hand was in reality a loan to individuals and that the corporate device was invoked at the lender's insistence to circumvent or evade the State's policy against usurious exactions. We assume, as Mr. Greenstein testified, that the original proposal came from him and that when the respondent was consulted on May 24, 1954 he was told that

the loan would be to a corporation to be formed. Neverthe-
less the respondent knew about the bonus and it was un-
doubtedly evident to him that the corporate device was being
used because of the usury laws. The use of his offices for
the consummation of the transaction despite such knowledge
is questionable enough but more disturbing is the fact that
he did not notify Mrs. English or Messrs. Warren and
English that they should have independent legal advice and
failed, in the absence thereof, to deal with them frankly and
fairly.

Canon 6 sets forth that it is unprofessional to represent
conflicting interests except by express consent of all con-
cerned given "after a full disclosure of the facts." Canon
32 declares that the lawyer advances the honor of his pro-
fession when he gives advice tending to impress upon his
client "the strictest principles of moral law." And Canon
29 directs lawyers that they should strive at all times to
uphold the laws and to maintain the dignity of the pro-
fession and "to improve not only the law but the adminis-
tration of justice." It seems clear to us that the respondent's
treatment of the borrowing interests, particularly Mrs. Eng-
lish, was violative of the Canons and tended to bring his
profession in disrepute. She had little education or knowl-
edge of business matters and was wholly unrepresented.
She was called upon to strip herself of her assets in an un-
conscionable transaction which netted a loan of $2,852.95
upon an obligation to pay that amount plus $1,000 bonus,
plus legal fees of $647.05—totalling $4,500 with legal inter-
est thereon. The marketable stocks which she actually put
up as security could readily have realized $2,000 and any
faithfully given independent advice, withheld by the re-
spondent, would have led her to obtain a direct loan thereon
or make a sale thereof. The respondent never advised her
as to the real reason for the formation of the corporation,
nor did he do anything towards avoiding imposition or cau-
tioning her against improvident action; his expressed notion
that under the circumstances he owed her no obligation to
explain anything does violence to basic principles of decency

and uprightness governing all members of his profession. *Cf. In re Carlsen*, 17 *N. J.* 338 (1955). We find, as did the Ethics Committee, that in the light of the nature of the transaction and the absence of independent representation, the respondent did not discharge his high professional responsibility to the borrowing interests and particularly Mrs. English, and that he should be appropriately disciplined therefor.

Under the evidence presented, we are not disposed to make any determination of misconduct beyond that encompassed in the above finding of guilt. The testimony does not convincingly establish the charges by the Ethics Committee that the respondent wrongfully conspired with Mr. Greenstein and thereafter falsely testified that he did not suggest to Messrs. Warren and English that they incorporate. Mr. Greenstein's testimony was that long before he ever met the respondent he knew that a corporation could not plead usury; that he told Messrs. Warren and English and Mrs. English that they would have to incorporate in order to obtain the loan; and that when he went to the respondent's office on May 24, 1954 he expressly told him that the proposed transaction contemplated a loan to the corporation to be formed with the borrowing interests paying all related expenses. The respondent's testimony was in accord and there is little affirmative evidence in the record to the contrary. The brief submitted by the Ethics Committee makes no specific reference to the charges resting on the alleged wrongful conspiracy and false testimony; indeed it seems to confine itself to (1) the matter upon which the respondent has been found guilty, and (2) the occurrence on January 4, 1955 when Messrs. Warren and English were ordered out of the respondent's office. While the respondent's conduct at that time left much to be desired we do not consider that it warrants any independent or additional finding of professional misconduct.

The only remaining question relates to the precise nature of the disciplinary order to be entered against the respondent. We must bear in mind that we are here concerned only with

the single transaction in which the respondent has been found to have failed to discharge faithfully his professional responsibilities. We assume there have been no others, and if perchance there have been, they will be dealt with appropriately whenever presented. In his recent work on *Legal Ethics* (1953) Henry S. Drinker, Chairman of the Standing Committee on Professional Ethics and Grievances of the American Bar Association, expressed the following views as to when disbarment, suspension or censure is warranted (*p.* 46):

"Ordinarily the occasion for disbarment should be the demonstration, by a continued course of conduct, of an attitude wholly inconsistent with the recognition of proper professional standards. Unless it is clear that the lawyer will never be one who should be at the bar, suspension is preferable. For isolated acts, censure, private or public, is more appropriate. Only where a single offense is of so grave a nature as to be impossible to a respectable lawyer, such as deliberate embezzlement, bribery of a juror or court official, or the like, should suspension or disbarment be imposed. Even here the lawyer should be given the benefit of every doubt, particularly where he has a professional record and reputation free from offenses like that charged."

Mr. Drinker's humane approach to the problem finds support in many judicial expressions. See *Bradley v. Fisher*, 13 *Wall.* 335, 80 *U. S.* 335, 355, 20 *L. Ed.* 646, 652 (1872); *In re Patterson*, 176 *F.* 2d 966 (9 *Cir.* 1949); Clark, J., in *In re Sacher*, 206 *F.* 2d 358, 361 (2 *Cir.* 1953), reversed *sub nom. Sacher v. Association of Bar of City of New York*, 347 *U. S.* 388, 74 *S. Ct.* 569, 98 *L. Ed.* 790 (1954); *In re Power*, 407 *Ill.* 525, 96 *N. E.* 2d 460 (1950). *Cf. In re Lentz*, 65 *N. J. L.* 134, 138 (*Sup. Ct.* 1900); *In re Breidt and Lubetkin*, 84 *N. J. Eq.* 222, 229 (*Ch.* 1915); *In re Ries*, 131 *N. J. L.* 559, 562 (*Sup. Ct.* 1944); *In re Frankel*, 20 *N. J.* 588 (1956). In the *Fisher* case Justice Field, in an opinion delivered for the United States Supreme Court, had this to say:

"Admission as an attorney is not obtained without years of labor and study. The office which the party thus acquires is one of value, and often becomes the source of great honor and emolument

to its possessor. To most persons who enter the profession, it is the means of support to themselves and their families. To deprive one of an office of this character would often be to decree poverty to himself and destitution to his family. A removal from the Bar should therefore never be decreed where any punishment less severe—such as reprimand, temporary suspension, or fine—would accomplish the end desired."

Similarly, in the *Breidt* case, Chancellor Walker, in an opinion suspending solicitors from practicing in the Court of Chancery for varying periods, made these observations:

"Proceedings to discipline a solicitor are civil and not criminal; and their purpose is not to punish the respondent, but to purify the bar and protect the court and the public from the fraud and imposition of reckless and unscrupulous lawyers. And yet, after all, I know of no better term in which to characterize the plight of a disciplined solicitor, one disbarred or suspended, than as 'punishment.' That is the term used by our supreme court in the *Cahill* case [*In re Cahill*, 66 *N. J. L.* 527], and it amounts to punishment by whatever name called. It involves disgrace to the solicitor, and takes from him a privilege, the enjoyment of which brings him business and the means of livelihood.

Now, it will be observed that in the *Cahill* case the Supreme Court said that conviction of a crime, or evidence that an attorney had committed one, or such intentional fraud upon the court or a client as shows evidence of moral turpitude, will justify disbarment. It does not say that disbarment must needs follow the establishment of either one of the three. This, of course, is so, as the extent of the punishment always rests in the sound discretion of the court. So that, even if the respondents to this rule are guilty of intentional fraud upon the court, they need not necessarily be disbarred. For less offenses than those mentioned, it will be remembered, the Supreme Court said temporary suspension would be 'proper punishment.' "

*Cf. Phillips and McCoy, Conduct of Judges and Lawyers* 85 *et seq.* (1952).

The Constitution of 1947 vests jurisdiction in this court over "the admission to the practice of law and the discipline of persons admitted." *Art.* VI, *Sec.* II, *par.* 3. In discharging its important responsibility for maintaining high professional standards amongst those associated with the administration of justice, the court must exercise its powers with just and decent regard for all the vital interests con-

cerned including those of the public, the bench and bar, and the individual respondents. In some instances we have been called upon, by the abhorrent nature of the offense and its serious and continuing reflection on the respondent's basic character, to order disbarment bearing in mind that, unlike most other states, an order of disbarment in our State is, in practical effect, permanent—the present Supreme Court has never reinstated a disbarred attorney. *Cf. Phillips and McCoy, supra,* 119. In other instances the court has, in the fair and conscientious exercise of its constitutional discretion, imposed lesser disciplinary measures which have varied from reprimands to suspensions for designated periods. See *In re Carlsen,* 17 *N. J.* 620 (1955) (three years); *In re Backes,* 16 *N. J.* 430 (1954) (one year); *In re Dworkin,* 16 *N. J.* 621 (1954) (one year); *In re Howell,* 10 *N. J.* 139 (1952) (six months); *In re Genser,* 16 *N. J.* 619 (1954) (two months); *In re Boyle,* 18 *N. J.* 612 (1955) (reprimand). In the ultimate, each case must rest largely upon its own particular circumstances. See *In re Carlsen,* 17 *N. J.* 338 (1955); *In re Genser,* 15 *N. J.* 600 (1954); *In re Rothman,* 12 *N. J.* 528 (1953); *In re Howell, supra; In re L. R.,* 7 *N. J.* 390 (1951); *In re Smith,* 15 *N. J. Misc.* 443 (*Sup. Ct.* 1937).

The court has concluded, upon due consideration of the precedents and the evidence bearing on the respondent's conduct in the instant matter, that his professional dereliction warrants suspension from the practice of law for a period of one year and until further order; judgment to that effect will be entered.

*For suspension for one year*—Justices HEHER, WACHENFELD, BURLING, JACOBS and BRENNAN—5.

*For suspension for two years*—Chief Justice VANDERBILT—1.