515 So.2d 678 (1987)
W. Perry GALLOWAY and Lake George Plantation, Inc.
v.
The TRAVELERS INSURANCE COMPANY, Richard W. Hickman, Kenneth R. Brantley and C. Milton Boyer.
No. 56026.
Supreme Court of Mississippi.
June 3, 1987.
Rehearing Denied December 2, 1987.
Don Barrett, Pat M. Barrett, Jr., James C. Patton, Jr., Barrett, Barrett, Barrett & Patton, Lexington, H.L. Merideth, Jr., Merideth & Daniels, Greenville, for appellants.
Lee David Thames, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, James W. Burgoon, Jr., Fraiser, Burgoon & Abraham, W. Wayne Drinkwater, Jr., *679 Lake, Tindall, Hunger & Thackston, Greenville, for appellees.
En Banc.
WALKER, Chief Justice, for the Court:
Perry Galloway and Lake George Plantation, Inc., filed suit against the Travelers Insurance Company and certain of its agents, alleging usury and tortious interference with business. After discovery and on motion of the defendants, the Circuit Court of Washington County entered summary judgment for the defendants as to both causes of action. Perry Galloway and Lake George Plantation, Inc., have appealed. Finding no reversible error, we affirm the judgment of the trial court.
Perry Galloway (Galloway) and George Whitsett (Whitsett) first began participating in business ventures together in 1965. Over the years they operated a cotton merchandising and shipping company, owned interests in a textile mill and a plastics factory, and conducted a trucking business as an adjunct to their cotton-shipping operation. During the 1970's, Galloway and Whitsett acquired, through several purchases, approximately 16,000 acres of farm land in Yazoo, Humphreys and Holmes Counties in Mississippi. The land was used in their agricultural venture which was known as G & W Farms.
The farming operation was a disaster and unprofitable, and by 1978 the land was heavily encumbered with debts which were in default; foreclosure was imminent. In the late fall of 1978, Richard Hickman (Hickman) and Danny Dew (Dew), agents of the Travelers Insurance Company (Travelers), approached Galloway to discuss a possible loan from Travelers. Hickman and Dew told Galloway that Travelers could lend $15,000,000.00 on two conditions: 1) a 5% brokerage fee would have to be paid to Hickman at closing, and 2) Galloway and Whitsett would have to form a corporation, to which all of the farm land would be deeded, and which would be the borrower of record. The necessity for forming a corporation was due to the restrictions of the applicable Mississippi usury statute discussed infra. Because the interest rate on the loan, calculated according to the actuarial method, was to be 11.7819%, the rate would be usurious if charged to an individual, but not usurious if charged to a corporation. Apparently the sole purpose of the incorporation was to make applicable the corporate, rather than the individual, ceiling on interest.
Galloway had no objection to the procedure, and Lake George Plantation, Inc., (Lake George) was formed. On March 8, 1979 the loan was made to the corporation, and neither Galloway nor Whitsett was personally liable on the note.[1] The corporation never transacted any business,[2] and the payments on the note were made by Galloway as an individual. The proceeds of the loan were distributed immediately in the following manner:

 To Kenneth Rogers for mortgage
 on farm land $76,645.00
 To First Tennessee Bank for note
 representing accumulation of
 loans from past Galloway/Whitsett
 business ventures $1,750,000.00
 To John Deere Company for farm
 equipment debt $6,858.98
 To Connecticut General for mortgages
 on farm land $3,903,973.10
 To Northwestern Mutual for mortgage
 on farm land $472,766.41
 To the Farmers Home Administration
 for crop loans $6,559,000.00
 To Travelers and for various fees $224,522.00
 To Lake George Plantation, Inc. $1,980,434.21

The loan from Travelers afforded Galloway/Lake George a temporary reprieve from financial woes. By September of 1980, however, the corporation was again in financial trouble, and Lake George Plantation, Inc., conveyed to Galloway the entire 16,000 acre tract, for which Galloway paid no consideration to the corporation. An attempt by Galloway to sell the land to a third party was unsuccessful, and Galloway *680 was forced to convey the land to Travelers in lieu of foreclosure.
Late in 1983, Galloway and Lake George filed suit against Travelers and certain of its agents. Of the four (4) original counts of the complaint, only two (2) are involved in the instant appeal: 1) a usury claim, alleging that the corporation was formed solely to circumvent the usury law and that the loan was therefore usurious, and 2) a claim for tortious interference with business, alleging that Travelers and its agents pretended to negotiate with Galloway for the orderly payment of the indebtedness while actually working to prevent him from obtaining financing, so he would be forced to convey the land to Travelers.
After discovery and on motion of the defendants, the trial court entered summary judgment for the defendants on both causes of action, holding, as to the usury claim, that the loan was made to a corporation, and holding, as to the tortious interference with business claim, that once Galloway/Lake George defaulted neither Travelers nor its agents had any duty to enter into an agreement with Galloway to resolve the default.
The instant appeal is a case of first impression in our State with regard to the issue which we now consider: when an individual has formed a shell corporation solely for the purpose of obtaining a loan which would otherwise be usurious, and when the individual has used the proceeds of the loan for a business purpose, is the loan usurious? We hold that it is not.
The applicable[3] usury statute is Miss. Code Ann. § 75-17-1 (Supp. 1979), which reads, in pertinent part, as follows:
(2) Any borrower may contract for and agree to pay a finance charge for any loan or other extension of credit made directly or indirectly to a borrower, which will result in a yield not to exceed ten percent (10%) per annum, calculated according to the actuarial method, which shall be known as the contract rate.
(3) Notwithstanding the foregoing and any other provision of law to the contrary, any domestic or foreign corporation organized for profit may agree to pay any rate of finance charge in excess of the maximum rate provided in this section, but not to exceed fifteen percent (15%) per annum, calculated according to the actuarial method, on any contract or other obligation under which the principal balance to be repaid shall originally exceed two thousand five hundred dollars ($2,500.00), or on any series of advances of money pursuant to a contract if the aggregate of sums advanced or originally proposed to be advanced shall exceed two thousand five hundred dollars ($2,500.00), or on any extension or renewal thereof; and as to any such agreement, the claim or defense of usury by such corporation, its successors, guarantors, assigns, or anyone on its behalf is prohibited.
Under applicable law, the loan which Travelers made would have been usurious if made to an individual, but not if made to a corporation. Galloway, who formed a corporation to obtain the loan and then used the proceeds primarily to discharge debts incurred in his business ventures, argues on appeal, as he did below, that the corporation was formed solely to circumvent the usury statute, and that the loan was therefore usurious.
Various state courts have considered this issue, and two lines of authority have developed. One, known as the "New Jersey Rule," had its origin in Gelber v. Kugel's Tavern, 10 N.J. 191, 89 A.2d 654 (1952). The lender in Gelber required the potential borrower, an individual, to incorporate. When the lender sued after default, the borrower counterclaimed, alleging usury. At the close of the proof, the trial court entered judgment for the lender on the counterclaim, on the ground that the loan had been made to a corporation. The New Jersey Supreme Court reversed, holding that a lender could not require an individual borrower to form a corporation which would "serve as a cloak to cover usurious transactions to evade the usury statute." Gelber, 10 N.J. at 197, 89 A.2d at 657. *681 Since Gelber, the New Jersey Rule has been reaffirmed by the courts of that state, In re Greenberg, 21 N.J. 213, 220, 121 A.2d 520, 524 (1956); Lesser v. Strubbe, 56 N.J. Super. 274, 285, 152 A.2d 409, 415 (1959), and has been followed in other jurisdictions, Walnut Discount Co. v. Weiss, 205 Pa.Super. 161, 208 A.2d 26 (1965), Havens v. Woodfill, 148 Ind. App. 366, 266 N.E.2d 221 (1971).
We believe the better rule is that adopted by the New York Supreme Court in Jenkins v. Moyse, 254 N.Y. 319, 172 N.E. 521 (1930). In Jenkins the court held that the loan was not usurious, although made to a corporation which was formed solely for the purpose of charging the higher interest rate. "The law has not been evaded," the Jenkins court held, "but has been followed meticulously in order to accomplish a result which all parties desired and which the law does not forbid." Jenkins, 254 N.Y. at 325-26, 172 N.E. at 522. The New York Rule, like the New Jersey Rule, has found a following in other jurisdictions. RepublicBank of Dallas v. Shook, 653 S.W.2d 278 (Tex. 1983); Rabinowich v. Eliasberg, 159 Md. 655, 659, 152 A. 437, 438 (1930). The Fifth Circuit Court of Appeals considered the issue in 1980 and concluded that the great weight of authority would not allow the borrower to claim usury when he formed the corporation to obtain the loan for a business purpose. In the Matter of LeBlanc, 622 F.2d 872, 878 (1980) (applying Louisiana law).
We agree with these authorities that the New York Rule is the better approach. The corporate form offers various options to those who choose it. Among these options is the opportunity to pursue financing which is unavailable to those who have not incorporated. When an individual acting in furtherance of a profit-oriented business venture chooses to incorporate solely for the purpose of obtaining such financing, he will not later be heard to complain that the loan was usurious.
Our adoption of the New York Rule does not mean that usury as a claim or defense is never available to one who forms a corporation at the lender's request. Although one who forms a corporation to obtain a loan for business purposes may not assert usury, the claim or defense is available when the proceeds of the loan are used to meet the individual's personal, non-business needs and obligations. The dispositive question is this: is the money used to further a profit-oriented business venture.[4] If so, the borrower may not claim usury, even if the loan proceeds were utilized to discharge debts incurred by the profit-oriented business venture prior to incorporation.
This aspect of the rule is well illustrated by the decision in a New York case, Schneider v. Phelps, 41 N.Y.2d 238, 391 N.Y.S.2d 568, 359 N.E.2d 1361 (1977). Alma G. Phelps was a seventy-five (75) year old widow whose only income consisted of Social Security benefits. In order to obtain a loan, she incorporated. The loan was personally guaranteed by Mrs. Phelps, and was secured by a second mortgage on her home. When the corporation defaulted, the lender sought to foreclose, and Mrs. Phelps interposed the defense of usury. The lender's motion for summary judgment was granted, but the Court of Appeals reversed and remanded, holding that a genuine issue of material fact existed as to the dispositive question: whether the loan was made in furtherance of a corporate or personal business enterprise, in which case the usury defense would be unavailable, or whether, on the other hand, it was made to discharge personal, non-business obligations, in which case the usury defense would be available. See also Buoninfante v. Hoffman, 48 A.D.2d 678, 367 N.Y.S.2d 984 (1975) (usury defense available where loan was obtained to discharge personal obligations, rather than in furtherance of corporate enterprise), Leader v. Dinkler Management Corporation, 20 N.Y.2d 393, 283 N.Y.S.2d 281, 230 N.E.2d 120 (1967) *682 (usury defense unavailable where proceeds used to further business ventures).
The Fifth Circuit, in LeBlanc, held that the key, in that case, to determining whether Louisiana courts would allow the borrower to assert usury was that the $8,000,000.00 was loaned to a profit-oriented enterprise for a business purpose. 622 F.2d at 877. Applying Louisiana law to those facts, the court held that the usury defense was unavailable to the borrower.

WAS SUMMARY JUDGMENT APPROPRIATE?
Turning to the case at bar, we next consider whether summary judgment was appropriate on the usury claim. Summary judgment should be granted only where the pleadings, discovery materials, and affidavits if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Miss.R.Civ.P. 56; New Orleans Great Northern Railroad Co. v. Hathorn, 503 So.2d 1201 (Miss. 1987); Brocato v. Mississippi Publishers Corp., 503 So.2d 241 (Miss. 1987); Joseph v. Tennessee Partners Inc., 501 So.2d 371 (Miss. 1987); Brown v. Credit Center, Inc., 444 So.2d 358 (Miss. 1983). The pre-trial order in the case at bar enumerated certain facts that were established by the pleadings, admissions or stipulation. Among these were 1) that Galloway and Whitsett owned and farmed approximately 16,000 acres, 2) that in each crop year from 1977 on, income from the land was not sufficient to repay the production or crop loan for the year, 3) that at the time of the loan Lake George was a Mississippi corporation, and 4) that when the brokerage fee was included in determining the interest rate, that rate calculated according to the actuarial method was 11.7819%. It is apparent from these facts, as established by pleadings, admissions or stipulation, that Lake George was a corporation formed to obtain financing for a profit-oriented venture, and that the interest rate, though usurious as to an individual, was lawful for a loan made to a corporation. These matters having been established, there was no genuine issue of material fact, and Travelers was entitled to judgment as a matter of law on the usury claim.
Finally, we must determine whether the trial court erred in entering summary judgment against Galloway on the claim of tortious interference with business. Galloway alleged that Travelers and certain of its agents, in an effort to acquire his land, carried out a plan of misrepresentation and deceit by pretending to negotiate with him for the orderly payment of the indebtedness, while actually working to prevent or delay him from obtaining an FmHA or other loan, so that he would be forced to convey the land to Travelers upon terms dictated by Travelers. The damages claimed by Galloway included 1) money damages caused by inability to plant some crops and delay in planting others, and 2) mental distress.
In its final judgment on this claim, the trial court noted that it was undisputed that "[b]eginning on January 1, 1982, Lake George was in default on its loan to Travelers, and Travelers had the legal right to foreclose on its Deed of Trust because of that default." The following were enumerated in the agreed pre-trial order as undisputed facts: 1) that neither the 1980 payment nor the 1981 payment was made when due, but each was paid within a year of the due date, 2) that the 1982 payment was not paid on the due date, and 3) that Travelers was not legally obligated to enter into agreement with Galloway to end "the 1982 default" (emphasis added). It is undisputed that Galloway was in default beginning January 1, 1982, and that the alleged tortious interference with business occurred in 1982.
The elements of tortious interference with business are
1) that the acts were intentional and willful;
2) that they were calculated to cause damage to the plaintiffs in their lawful business;
3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on *683 the part of the defendant (which constitutes malice); and
4) that actual damage and loss resulted.
Protective Service Life Insurance Co. v. Carter, 445 So.2d 215, 217 (Miss. 1983); Irby v. Citizens National Bank of Meridian, 239 Miss. 64, 121 So.2d 118, 119 (1960).
In an effort to prove the third element, that is, that Travelers' acts were "done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant," Galloway attempted to show that Travelers sought to force him to convey the land to Travelers on Travelers' terms. The "unlawful purpose" of the alleged tortious interference was to obtain Galloway's land by forcing default.
It is clear, however, that Galloway's claim was based on actions taken by Travelers after default. Thus, Galloway could not establish the third element of his claim, i.e., that Travelers' acts were "done with the unlawful purpose of causing damage and loss, without right or justifiable cause." It is nonsensical for Galloway to claim that Travelers, in order to force default, deliberately delayed resolution of the default. How could  and why would  Travelers force default when default had already occurred? Thus, the pleadings, affidavits and discovery materials made it manifest that Galloway, who would bear the burden of proof at trial on the tortious interference claim, could not establish the "unlawful purpose" element of the tort.
The United States Supreme Court[5] addressed a similar factual setting in Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Catrett filed suit against Celotex and others, alleging that her late husband's death had resulted from exposure to asbestos products manufactured or distributed by the defendant companies. Celotex moved for summary judgment, asserting that Catrett had no evidence that her late husband had been exposed to Celotex's asbestos products. Though remanding the case for a determination of whether an adequate showing of exposure to Celotex's products had been made, the Court held as follows:
Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.
Celotex, 477 U.S. at ___, 106 S.Ct. at 2552-53, 91 L.Ed.2d at 273.
The Court also stated the following:
The Federal Rules of Civil Procedure have for more than 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 FRD 465, 467 (1984). *684 Before the shift to "notice pleading" accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources. But with the advent of "notice pleading," the motion to dismiss seldom fulfills this function any more, and its place has been taken by the motion for summary judgment. Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.
Celotex, 477 U.S. at ___, 106 S.Ct. at 2555, 91 L.Ed.2d at 276.
Our own construction of Rule 56 embodies this concept that when a party, opposing summary judgment on a claim or defense as to which that party will bear the burden of proof at trial, fails to make a showing sufficient to establish an essential element of the claim or defense, then all other facts are immaterial, and the moving party is entitled to judgment as a matter of law. In Chatam v. Gulf Publishing Company, Inc., 502 So.2d 647 (Miss. 1987), we reviewed the circuit court's entry of summary judgment in favor of the defendant in a defamation case. We enumerated the elements of the tort: 1) false and defamatory statement concerning another, 2) unprivileged publication to a third party, 3) fault amounting to at least negligence on the part of the publisher, and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. Chatham, 502 So.2d at 649. We then affirmed summary judgment for the defendant based on our holding that the statements involved were not defamatory. Chatham, 502 So.2d at 650. Thus, we affirmed summary judgment where the nonmoving party, who would have had the burden of proof at trial, failed to make a showing sufficient to establish an essential element of the claim.
In the case at bar, Galloway failed to make an adequate showing on an essential element on which he would bear the burden of proof at trial. Therefore, summary judgment in favor of Travelers on this claim was appropriate.

CONCLUSION
Under the rule which we adopt today, when an individual acting in furtherance of a profit-oriented business venture forms a shell corporation to obtain a loan that would be usurious if made to an individual, the transaction is not usurious. Because it was manifest from the pleadings, affidavits and discovery materials that Lake George was such a corporation, summary judgment in favor of Travelers on the usury claim was appropriate. The pleadings, affidavits and discovery materials also showed affirmatively that Lake George was already in default at the time of the alleged tortious interference with business. Therefore, there was a complete failure of proof as to the "unlawful purpose" element of the tort. Thus, summary judgment for Travelers on the tortious interference claim was appropriate. The judgment of the trial court is affirmed.
AFFIRMED.
ROY NOBLE LEE and HAWKINS, P.JJ., and PRATHER, ROBERTSON, and GRIFFIN, JJ., concur.
ROBERTSON, J., specially concurring.
ANDERSON, DAN M. LEE and SULLIVAN, JJ., dissenting.
ROBERTSON, Justice, concurring:

I.
I join without hesitation the judgment announced this day by the majority affirming as it does the judgment of the Circuit Court of Washington County, Mississippi. I write separately because my reasons for *685 concluding that the judgment on the usury claim should be affirmed are somewhat different from those articulated by the majority. Compare majority opinion, pp. 680-682.

II.
To begin with, this is one of those cases where this Court, by the nature of its constitutionally mandated duty to adjudge, must make law. This is so for the simple reason that the case must be decided  and when it is decided it becomes precedent which will certainly be treated by future litigants as indicia of law. This is for the reason that the decision does in fact announce law.
Many lawyers, even those not unfamiliar with the idea of a case of first impression, cling to the cherished conviction that courts merely find the law, but that they do not make it. This is not so. Demystification of the judicial process in this regard may be traced to an early pronouncement of Oliver Wendell Holmes, Jr. (he was a mere 56 years old at the time) in The Path Of The Law, 10 Harv.L.Rev. 457, 466 (1897). Holmes unabashed declaration that courts do and must legislate was repeated in Southern Pacific Co. v. Jensen, 244 U.S. 205, 218-23, 37 S.Ct. 524, 530-32, 61 L.Ed. 1086, 1099-1102 (1917) (Holmes, J., dissenting), although he there recognized that judicial legislation is certainly subject to the constitutional doctrine of legislative superiority (as distinguished from omnipotence).
At the time of the operative events of the case at bar this state had in place law providing that the maximum rate of interest that may have been charged upon an extension of credit to an individual was ten percent per annum. The maximum rate of interest that may have been lawfully exacted from a corporation incident to an extension of credit was fifteen percent. See Miss. Code Ann. § 75-17-1 (1972) (which has in respects not relevant here since been amended). We have  or, more precisely, we had, before today  no law declaring whether an extension of credit is lawful where the rate contracted for and paid exceeds ten percent but where the debtor was a corporation organized for the sole purpose of rendering legal a loan in excess of ten percent. In short, we must make law today.
As the majority opinion filed this day reflects, the courts of other states have recognized differing rules of law when presented with a circumstance legally analogous to that presented to us today. The so-called New Jersey rule originating in Gelber v. Kugel's Tavern, 10 N.J. 191, 89 A.2d 654 (1952) appears to hold that such loans are usurious in that a lender may not require a borrower to create a corporation to "serve as a cloak to cover usurious transactions to evade the usury statute." 10 N.J. at 197, 89 A.2d at 657. On the other hand, there is the so-called New York rule originating in Jenkins v. Moyse, 254 N.Y. 319, 172 N.E. 521 (1930) which held such a transaction wholly lawful, stating that the exaction of the higher rate of interest from the newly formed corporation is not usurious.
The law has not been evaded but has been followed meticulously in order to accomplish a result which all parties desired and which the law does not forbid.
254 N.Y. at 324, 325, 172 N.E. at 522-23. The majority adopts the New York rule, though adding in dicta a qualification with respect to which I have reservations, as will become apparent from what I will have to say in Part III below.
I would proceed to decision in this case using as my beginning point the statutory framework of the then existing version of Section 75-17-1. Gaps in the law such as those we confront today must be filled by reference to policy considerations the same as though we were a deputy legislature. That other states have wrestled with the problem and have reached differing results is of value but hardly produces an inexorable answer.
Our policy choices are not unlimited. Our legislation today is "interstitial," Southern Pacific, 244 U.S. at 221, 37 S.Ct. at 531, 61 L.Ed. at 1100. It should not *686 conflict with principles[1] derived from the best, most intelligent reading we may give the law already in place. Subject to those limitations we are indeed, today as every day, a deputy legislature. The policy considerations I would credit and have inform our legislative effort are economic in nature.

III.
There are economic realities concerning interest rates and finance charges made in credit transactions which ought be recognized. In an economic sense, credit is a commodity in the same way that a television set is. A finance charge is the price at which the credit commodity sells. The true rates and amounts of finance charges, as is the case with all other prices, are largely set by the market place. The forces of supply and demand, the cost of making credit available, the cost of administering credit extension, the risk of default and the like, and many other economic factors, are ultimately going to determine the true cost of credit. Except on a temporary basis, these factors cannot be overridden or controlled by legislative fiat.
Seen in the above context, we confront, and begin with, the myth that the true cost of credit can be, or is being, controlled by usury statutes or other rate ceilings imposed by law.
[I]f ceilings imposed are so low that credit grantors cannot make a reasonable profit, they will either obtain a reasonable profit from some other source or by some other name or they will cease extending credit, in whole or in part. Consequently, it is no more possible for legislatures to keep down or force down rates of interest by setting maximum ceilings and maintain the same quantum of credit than it would be for legislatures to forbid inflation.[2]
... If legislative ceilings on credit charges are not consistent with basic economic principles, they will no more keep down or force down interest rates generally (and provide the same quantum of credit) than King Canute was able in the year 1028 to hold back the tidal waters of Denmark and England.[3]
There are three basic cost components in any loan. These are (1) the cost of money, (2) the lender's fixed overhead expenses, and (3) the risk of default.[4] No lender can with impunity ignore these costs in setting the prices on the loans he makes. Likewise, no regulatory body can afford to ignore these costs in imposing ceilings on the lender's prices.
When faced with an unreasonably low ceiling, the lender will lower the only one of these three cost components over which he has much control: the risk cost. He will do this by lending only to low risk consumers. Where rate ceilings are higher, the risk which the lending industry can afford to take is correspondingly higher. Here again, the raising or lowering of rate ceilings does not affect creditor profits nearly as much as it affects the availability of credit and the number of consumers eligible for credit.
Low rate ceilings are invariably justified on the grounds that they protect the consumer, but this is simply not so. The only persons protected by low rate ceilings are *687 that small group of borrowers who, were it not for the rate ceiling, would probably have been required to pay a slightly higher rate, but are sufficiently creditworthy to receive credit at the ceiling rate.[5] Indeed, the evidence is overwhelming that interest rate limitations invariably harm those individuals, namely the poor, they purport to benefit. See, e.g., Crafton, An Impirical Test Of The Effect of Usury Laws, 23 Journal of Law & Economics 135 (1980).
When viewed in light of the economic realities involved, rate ceilings, rather than being regulators of the true rates charged for consumer credit, must be seen as social judgments concerning the kinds of people entitled to credit.[6] As former Senator Paul H. Douglas has put it:
[T]he question of the proper rate ceiling is really a matter of social policy rather than a contest between creditors and consumers. At what point does a rate become so high that society expresses the judgment that it is unconscionable and that the individual must do without the credit rather than pay the unconscionably high rates?[7]
This question is difficult enough to answer in the theory. It becomes even more difficult in view of the fact that the persons called upon to provide the answer  the legislators, legislative and judicial varieties  are almost never the individuals who will be directly affected by the decision. Those making the decision are thus put in the posture of passing judgment on the needs and wants, not of themselves, but of others. Perry Galloway, insofar as the credible evidence in the present record reflects, was faced with a choice between incorporation, on the one hand, to obtain high interest rate refinancing, and liquidation, on the other. Economic common sense persuades me that we should make no ex post facto law regarding that choice. Subject only to the outside limits of conscionability, I believe the best course for our law to follow is to let the borrower seeking the credit make the decision for himself as to whether he will pay a high rate.

IV.
The policy considerations just enumerated are the ones that ought most inform the content of the interstitial legislation we announce today.[8] These lead in my view to a rule which allows the parties to contract for any rate not prohibited by law. At the time in question, nothing in Section 75-17-1 declared usurious the transaction here under scrutiny. Economic realities dictate that we afford our usury laws no extended application to cases not clearly within their coverage. Accordingly, I would affirm.
ANDERSON, Justice, dissenting:
Today's decision reminds me of a story from the times of prohibition. It is said that in those days one could buy a package of barley malt that came complete with the following admonition:
WARNING: Do not grind, mix with water, add hops and boil for 3 1/2 hours, allow to cool, add yeast, and place in a sealed storage container for 7 days, or an illegal beverage will result.
The majority's holding may not yield home brew, but it certainly provides lenders with a road map around our usury statute.
In discussing my reasons for not following the majority, I shall also refer to Justice Robertson's concurring opinion, for it seems to me that some of the ideas expressed therein have been tacitly adopted by the majority.

*688 I. TORTIOUS INTERFERENCE
I fully agree with the majority that summary judgment was proper as to Galloway's claim for tortious interference with business.
Unfortunately, that just about exhausts our areas of agreement.

II. PROCEDURAL DISPOSITION OF THE CASE
Even if I agreed with the majority as to the adoption of the "New York rule" concerning the use of a dummy corporation to conclude a high-interest loan, I would doubt that the case could be properly disposed of by a simple affirmance. As I understand it, the majority adopts the New York rule as to loans made for a business purpose, for the opinion explicitly says that defense of usury remains available "when the proceeds of the loan are used to meet the individual's personal, non-business needs and obligations."
At this point, it becomes important to remember that this case came before us as an appeal of a summary judgment. The granting of a summary judgment is, of course, not proper unless there are no material issues of fact in dispute. Rule 56(c), M.R.C.P.
There was some evidence that all of the funds of the loan to Lake George Plantation, Inc. were not used for business purposes. The deposition of Galloway contains the following:
Q. So that when the $15 million loan was closed Lake George, Inc., the corporate entity, borrowed the money. Right?
A. That's right.
Q. It used the money to pay off all of the debts for which you and George Whitsitt and your wives were personally liable?
A. Individually owed, yes, sir.
* * * * * *
Q. All right. In the second paragraph he talks about the fact that Lake George will use the proceeds of the Travelers loan to pay off the mortgages assumed and then will pay the balance of the net proceeds to you as boot. We'll look at the closing statement in a few minutes.
But I gather from this and from the closing statement that there was a certain amount of money left over after the payment of all the mortgages and after the payment of the commission and other things that did come to Lake George. Right?
A. To Lake George?
Q. Or to you and Mr. Whitsitt, which?
A. We paid our outstanding debts with it, yes, sir.
This raises questions as to the nature of the personal debts thus paid  especially those of the wives. From the record before us, we cannot tell whether, and to what extent, the loan funds were used for purposes unrelated to the farm business. That question could be resolved only by a full trial.
Thus, even if the New York rule be the better one, it seems to me that the case ought to be remanded for resolution of these factual issues rather than affirmed.

III. USURY AND MISSISSIPPI PUBLIC POLICY
The so-called "New Jersey rule" has tended to be adopted by states with a traditionally strong public policy against usury. The courts of these states have viewed anti-usury statutes as remedial legislation, to be given a liberal interpretation. New Jersey itself has noted the development of the New York rule, but rejected it in order that "sympathetic sweep might be given to the state's policy against usury." In re Greenberg, 21 N.J. 213, 220, 121 A.2d 520, 524 (1956). Pennsylvania takes a hard line against the use of dummy corporations, a position also based on "the state's strong public policy against usury." Walnut Discount Co. v. Weiss, 205 Pa.Super. 161, 166, 208 A.2d 26, 28 (1965).
The point is significant because, until today, Mississippi also had a broad public policy against usury. Indeed, we have had an anti-usury statute since our territorial days. See An Act against Usury (passed March 1, 1805), Toulmin's Statutes of the *689 Mississippi Territory 404-405 (1807). See also, An Act Regulating the Rate of Interest (passed January 25, 1822), Poindexter's Code ch. 105 at 460-61 (1823). (The distinction in interest rates between individual and corporate loans is of more recent origin. Act of June 15, 1966, ch. 317, 1966 Miss. Laws 618-19 (codified as MCA § 75-17-1 (1972)). The law's provisions are penal, and so a heavy burden of proof as to the fact has been required. E.g., Ranson v. Snyder, 222 Miss. 248, 254, 75 So.2d 738, 740 (1954); Yeager v. Ainsworth, 202 Miss. 747, 766, 32 So.2d 548, 555 (1947). But despite this pro-creditor rule of construction, this Court has heretofore had little patience with strategems to make loans at a higher rate than the statute allows. In an early case, we spoke in words that could have been well-used today:
[T]he law against usury could easily be avoided and evaded if creditors, by resorting to the simple device of taking from the debtor a contract legal in form, for the performance of some obligation not prohibited by law could bar the courts from exploring the transaction to discover its real character. If, as the pleas state and the demurrers admit, the contract sued on was really a scheme and device to cover usurious interest, it is as incapable of supporting an action as though its true nature and purpose were written on its face.

Grayson v. Brooks, Neely & Co., 64 Miss. 410, 416, 1 So. 482, 483 (1887).
In a later case, we held that "the public policy of this state condemns usury... . [C]ourts will look to and construe the transaction by its substance and effect, rather than its form, and will permit no scheme or device, however ingenious, to hide the face of usury." Richardson v. Cortner, 232 Miss. 885, 891, 100 So.2d 854, 857 (1958). Accord, Kennedy v. Porter, 176 Miss. 742, 748, 170 So. 286, 287 (1936).
In view of the majority's holding today, it is not surprising that their opinion carefully avoids any discussion of our case law on usury.

IV. THE ROLE OF THE JUDICIARY IN THESE MATTERS
Justice Robertson's concurrence offers some excellent opinions on the inevitability of law-making by judges. To a good deal of what he says, no reasonable exception can be taken. Today it is universally acknowledged that judges must and do make law. No longer does any knowledgeable person believe that the law subsists somewhere "out there" like a Platonic archetype, and that judges have only to discover it. But one need not subscribe to that idea in order to recognize that judicial legislation is legislation of a very special sort, and subject to certain peculiar rules. "[J]udges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions." Southern Pacific Co. v. Jensen, 244 U.S. 205, 221, 37 S.Ct. 524, 531, 61 L.Ed. 1086, 1100 (1917) (Holmes, J.) There is no escape from judicial legislation, but that does not mean that judges have carte blanche to make whatever laws they please. One great judge put it this way:
The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuant of his own ideal of beauty or of goodness... . He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to the primordial necessity of order in the social life. Wide enough in all conscience is the field of discretion that remains.
B. Cardozo, The Nature of the Judicial Process, 141 (1921).
All of this has serious implications for our position vis-a-vis the legislature. In fields where that body has acted our own legislation, if it is to be proper, must be supplemental in character and related to the fact that no legislature can do everything, foresee every contingency, or provide for every detail. Where the legislature has lawfully established a clear policy, one not forbidden by our constitution or by that of the United States, we may not annul that policy or condone efforts to circumvent it. On the contrary, we have a duty to further the ends of such a policy, even where that *690 requires an interpretation going beyond the letter of the statute  and, in the past, we have repeatedly recognized that duty. E.g., Aikerson v. State, 274 So.2d 124, 127 (Miss. 1973); State Highway Comm'n v. Coahoma County, 203 Miss. 629, 651, 32 So.2d 555, 560 (1947); Sheffield v. Reece, 201 Miss. 133, 143, 28 So.2d 745, 759 (1947). It has been well said that a statute should be read "not narrowly as through a keyhole, but in the broad light of the evils it aimed at and the goals it hoped for." U.S. ex rel. Marcus v. Hess, 317 U.S. 537, 557, 63 S.Ct. 379, 391, 87 L.Ed. 443, 456 (1943) (Jackson, J.) Similarly, Holmes once said that:
The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before.

Johnson v. U.S., 163 F. 30, 32 (1st Cir.1908) (Holmes, J).
The principle should apply with equal force where the legislature has left a public policy intact where we might have thought it more expedient to change or modify it.
In our holding today, however, we take our stand at the opposite pole from these giants. Our legislature has established a clear public policy against usury, but because it failed to anticipate and forbid a particular trick of would-be usurers, we agree to look the other way when it is employed.
The fact that we are doing this is disturbing in itself; our reasons for doing it make it even more so. The rationale behind the "New York rule" on usury was candidly proclaimed by the Court of Appeals of that state to be the following:
The basic foundation of our ecomony rests on the system of free enterprise, and persons seeking to obtain financing, frequently by resort to paper corporate intermediaries, or business enterprises should expect to pay the market rate for the investment capital that they require... . So long as the borrower is aware of the potential risk and acts in the belief that the ultimate profit justifies the risk undertaken, the free market in money operates without friction and there is no need for legislative or judicial interference. If the venture falls through or if the profits do not reach anticipated levels, the businessmen will not be relieved from the consequences of his bad bargain, just as the courts will not relieve a promisor from the allegations of an improvident contract.
Schneider v. Phelps, 41 N.Y.2d 238, 243, 259 N.E.2d 1361, 1365, 391 N.Y.S.2d 568, 571 (1977), See also Republic Bank of Dallas, v. Shook, 653 S.W.2d 278, 282 (Tex. 1983).
In other words, without so much as a by-your-leave to the legislature we are unilaterally deciding that the availability of loans in Mississippi must be governed by principles of laissez-faire economics.
I do not wish to be understood as arguing that those economic principles are wrong or bad. They may be, or they may not be. What I am saying is that we should not try to write them into our law without clear legislative warrant.
As Holmes once said, when confronted with a similar attempt to incorporate economic doctrine in the law:
This case is decided upon an economic theory which a large portion of the country does not entertain. If it were a question whether I agreed with that theory, I should desire to study further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority to embody their opinions in law. It is settled ... that ... state laws may regulate life in many ways which we as legislators might think as injudicious, or if you like as tyrannical, as this .. . Sunday laws and usury laws are ancient examples.

*691 Lochner v. New York, 198 U.S. 45, 75, 25 S.Ct. 539, 546, 49 L.Ed. 937, 949 (1905) (Holmes, J., dissenting) (Emphasis added).
At this particular court, we are fortunate to have at least one judge who is wellversed in economic theory; the concurring opinion contains a very able discussion of the factors involved in the lending of money. Judges as a class, however, cannot lay claim to any ex officio mastery of economics. When we decide cases involving economic doctrines, we must rely on the evidence furnished by the experts. In the present case, how much such evidence was adduced? None whatsoever in the court below, and only a smattering before us on appeal.
But even if we were all Nobel laureates in economics, and the pertinent economic issues had been exhaustively briefed, I submit that we would still not be justified in pronouncing on the merits of conflicting economic theories. Where is our commission to do so? By what authority do we claim the right to commit the state to a particular school of economic thought? I know of none. Insofar as such a power exists, it must rest with the legislature.

V. SELECTIVE ECONOMIC REALISM
The majority's holding obviously depends on the "economic realities" of the situation as we perceive them. One wonders, then, why all of the "economic realities" of cases like this were not weighed in the balance. The opinion says that "[w]hen an individual ... chooses to incorporate solely for the purpose of obtaining [high interest] financing, he will not later be heard to complain that the loan was usurious." (Emphasis added). On the record before us, I cannot step through the looking-glass with the majority and discuss this situation in terms of the borrower's "choice." Galloway's bargaining power was sub-zero. His "choice" was Hobson's; he had to accept whatever terms Travelers wanted to impose, or be ruined. To speak to him as having "chosen" to do this makes no sense at all.
The very source of the rule we now adopt, the New York Court of Appeals, spoke eloquently to this point:
The purpose of usury laws from time immemorial, has been to protect desperately poor people from the consequences of their own desperation. Lawmaking authorities in almost all civilizations have recognized that the crush of financial burdens causes people to agree to almost any conditions of the lender and to consent to even the most improvident loans. Lenders, with the money, have all the leverage; borrowers, in dire need of money, have none. Schneider v. Phelps, supra, 41 N.Y.2d at 243, 359 N.E.2d at 1366, 391 N.Y.S.2d at 571-72.
However, neither the New York Court nor this Court nor any other court that I have heard of has explained why a person in danger of losing his shirt because of business reversals is less desperate or less worthy of the law's solicitude than one in danger of losing it for some other reason. To my mind, Galloway is obviously a member of the class the legislature intended to protect by enacting the statute.
Under current "economic realities", we can expect to see many corporate lenders like Travelers trying to exploit the agricultural crisis of the 1980's by amassing large holdings of land at the expense of stricken individuals like Galloway. All they need do is make high-interest loans to desperate people who are likely to default on them. In effect, today's decision sets our seal of approval on such predatory tactics.

CONCLUSION
Today's decision goes far beyond the "interstitial" legislation permitted to judges. Today we have repudiated a public policy dating from the time of the Mississippi territory. We have ignored a hundred years of our own case law. We have disregarded the clear intent of a statute and provided its would-be evaders with helpful instructions, because the statute evinces economic assumptions we consider outdated and unwise. In so doing, we have arrogated to ourselves the power to decide which of conflicting economic theories shall be the states's accredited doctrine.
It may be that we must sometimes act as the "deputy" of the legislature, but it is the *692 duty of a deputy to have some respect for his principal. Today, rather, we have assumed the position of Mayor of the Palace, and relegated the legislature to the role of a Merovingian emperor.
I respectfully dissent.
DAN M. LEE and SULLIVAN, JJ., join this dissent.
NOTES
[1] Had Galloway been an endorser or guarantor of the note, our holding in this case would likely be different.
[2] Travelers had no control over, or responsibility for, the actions or inaction of the corporation.
[3] The code section has since been amended. See 1986 supplement.
[4] In adopting this business purpose rule, we are aware that our usury statute has been amended to allow the "corporate" rate to be charged to nonprofit organizations. Miss. Code Ann. § 75-17-1 (Supp. 1986). That provision simply allows nonprofit organizations to take advantage of the broader range of financing sources available to the entities listed in § 75-17-1(3).
[5] The High Court's interpretation of the federal counterpart to our Rule 56, though not binding upon us, is "persuasive of what our construction of our rule ought to be," Brown v. Credit Center, Inc., 444 So.2d 358, 364 n. 1 (Miss. 1983).
[1] I accept without hesitation that there are several principles floating around that on occasion have influenced the result in particular cases. One of these would be the principle which forbids doing indirectly that which the law prohibits one from doing directly. That principle, when applied to the case at bar, would suggest that the present transaction is usurious. Conversely, there is the principle of legal freedom, that is, that individuals corporate and otherwise should be perceived to operate in a general state of freedom restricted only insofar as the law imposes restrictions, that insofar as the law has not prohibited the present transaction, it is lawful. That principle, of course, would lead to a conclusion that the present transaction is not usurious.
[2] Malcolm, The New Maximum Charges in R. Johnson, The Realities On Maximum Ceilings On Interest and Finance Charges 33 (1970).
[3] Id at 34.
[4] An Empirical Study Of The Arkansas Usury Law: "With Friends Like that ...", 1968 U.Ill.L. Forum 544, 561-62 (1968); Benfield, Money, Mortgages and Migraine  The Usury Headache, 19 Case W.Res.L.Rev. 819, 826-30 (1968).
[5] Johnson, The New Law of Finance Charges, 33 Law & Contemp.Prob. 671, 684 (1968); Johnson, Interest and Usury, in R. Johnson, The Realities Of Maximum Ceilings On Interest and Finance Charges 16 (1970).
[6] Statement of Senator Paul H. Douglas to the Massachusetts Legislature, January 29, 1969; Malcolm, The New Maximum Charges in R. Johnson, The Realities Of Maximum Ceilings On Interest and Finance Charges 34 (1970); Benfield, supra note 4, at 833, 874.
[7] Douglas, supra note 6.
[8] I have in the past  as now  found these considerations persuasive. See Robertson, Myth And Reality In Consumer Credit Rate Regulation, 43 Miss.L.J. 429 (1972).