BEAM, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:
 

 ¶ 32. Respectfully, I dissent from the majority's decision to reverse the trial court's grant of summary judgment in favor Grand Casinos as to the McGintys' breach-of-implied-warranty claims. The McGintys have failed to present sufficient evidence the pork chop they claimed they ate in 2004 at Island View Café inside the Grand Casinos, was contaminated with poisonous bacteria and thus unfit for human consumption. Accordingly, I would hold their breach-of-implied warranty claims also fail as a matter of law.
 

 ¶ 33. The only evidence presented in support of the McGintys' claim they both became ill from a contaminated pork chop is their deposition testimony and an unsworn letter from Dianne McGinty's treating physician in California that Dianne's illness was "related to food and drink." As Grand Casinos submitted in the trial court in support of its motion for summary judgment, this letter is wholly insufficient to establish the pork chop was "infect[ed]" with poisonous bacteria, as asserted in the McGintys' complaint.
 

 ¶ 34. In every case cited by the majority in support of its decision, expert evidence was presented that the consumer's illness was caused by food poisoning. Such is necessary in this case, and none has been presented.
 

 ¶ 35. In
 
 Goodwin v. Misticos
 
 ,
 
 207 Miss. 361
 
 ,
 
 42 So.2d 397
 
 , 399-402 (1949), the treating physician testified at trial that he diagnosed the patient's illness as "ptomaine poisoning," which he explained is a "bacterial infection of the alimentary canal," carried there by food or drink.
 

 ¶ 36. In
 
 Armour & Co. v. McMillain
 
 ,
 
 171 Miss. 199
 
 ,
 
 155 So. 218
 
 , 219 (1934), the treating physician testified at trial the consumer's symptoms were caused from "acute botulism, or other food poison taken into the stomach when she ate the sausage."
 

 ¶ 37. In
 
 Cudahy Packing Co. v. Baskin
 
 ,
 
 170 Miss. 834
 
 ,
 
 155 So. 217
 
 (1934), the consumer's treating physician testified that the consumer "was suffering from acute botulism, an illness caused by the eating of food containing the germ known as claustralian botulinus."
 

 ¶ 38. And in
 
 L.W. ex rel. Ware v. Tyson Foods, Inc.
 
 , No. 1:10CV330-LG-RHW,
 
 2011 WL 3476574
 
 , **2-3 (S.D. Miss. Aug. 9, 2011), the plaintiff was diagnosed with bacterial-born food poisoning, "campylobacter bacteria."
 

 ¶ 39. Comparatively, in
 
 Doss v. NPC International, Inc.
 
 , No. 4:09 CV 38,
 
 2011 WL 754891
 
 (N.D. Miss. Feb. 24, 2011), the federal district court granted summary judgment in favor of the defendant after finding "the plaintiffs will be unable to establish that they were served food that was unfit for human consumption, based on the documents and exhibits before the court." The district court said:
 

 Not one plaintiff was definitively diagnosed with food poisoning. Rather, physicians diagnosed a few patients with possible food poisoning apparently based on the sole fact that symptoms included nausea and diarrhea and the patient's statements to physicians that they had been exposed to undercooked food. To conclude that Plaintiffs suffered from gastroenteritis at the hands of undercooked food prepared by the Defendant would be speculative at best. "It is well settled in ... Mississippi that a verdict may not be based on surmise or conjecture and that to prove a possibility only is insufficient to make a jury issue."
 
 John Morrell & Co.
 
 , 208 So.2d [906,] 907 (Miss. 1968) (citing
 
 Berry v. Brunt
 
 ,
 
 252 Miss. 194
 
 ,
 
 172 So.2d 398
 
 (1965) ).
 

 Doss
 
 ,
 
 2011 WL 754891
 
 , *3.
 

 ¶ 40. The majority finds
 
 Doss
 
 distinguishable because there, the plaintiffs sued under negligence, not breach of implied warranty. But as the majority implicitly recognizes, the only practical difference between the two theories is the duty-of-care element required for negligence, which is not required for implied warranty. The causation requirement, however, is the same for both theories.
 

 ¶ 41. Clearly, based upon the aforementioned finding(s) by the federal district court, the district court would have reached the same conclusion in favor of the defendant even if the plaintiffs had sued under implied warranty.
 

 ¶ 42. Conversely, the same can be said with
 
 Goodwin
 
 , which-respectfully-both the majority and the Court of Appeals have completely misconstrued in this instance. Having thoroughly read and considered
 
 Goodwin
 
 , there remains no question in my mind that had there not been expert evidence in the case affirmatively establishing that the consumer's illness was caused by food poisoning, the
 
 Goodwin
 
 Court would not have included any of
 its dicta in the opinion with regard to implied warranty.
 

 ¶ 43. Here, similar to
 
 Doss
 
 , and unlike in
 
 Goodwin
 
 ,
 
 McMillain
 
 ,
 
 Baskin
 
 , and
 
 L.W.
 
 , neither of the McGintys was medically diagnosed with food poisoning. For Joe, no medical information whatsoever relating to his alleged visit to the emergency room in California has been provided. For Dianne, all we have is an unsworn letter from her treating physician saying she suffered from "upper gastrointestinal bleeding" that "was caused by the severe vomiting, ... related to food and drink [she] had prior to the event."
 

 ¶ 44. Even if the letter was admissible as evidence (which it is not), no reasonable inference beyond speculation can be drawn from it that Dianne's illness was the result of food poisoning. And in turn, no inference can be drawn from Dianne's illness that the pork chop she ate contained harmful bacteria which rendered the food unfit for human consumption. Furthermore, the letter actually confirms (rather than excludes) what Dianne's prior medical records show, that she has experienced similar episodes in the past due to other ongoing medical conditions.
 

 ¶ 45. The majority, however, declines to address or consider this because it finds that: (1) Grand Casinos did not object to the "form" of the California physician's letter; and (2) "the content of the evidence-the treating physician's opinion could be admissible at trial, if properly presented." Respectfully, the majority is incorrect on each point.
 

 ¶ 46. Contrary to the majority's finding, Grand Casinos did object to the California physician's letter. Grand Casinos moved for summary judgment on the ground there is no sufficient medical expert evidence that the McGintys' alleged illnesses were caused by a tainted pork chop. In response, the McGintys offered the above-mentioned, unsworn letter from Dianne's treating physician in California. Grand Casinos replied, claiming the letter "is not even close to sufficient to establish that the pork chop 'was infected by poisonous bacteria[.]' " I completely agree.
 

 ¶ 47. While Grand Casinos bears the initial burden of supporting its motion for summary judgment, the McGintys retain the burden of proof throughout their implied-warranty cause of action. When the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production for Rule 56 purposes, by either (1) affirmatively negating an essential element of the nonmoving party's claim or (2) demonstrating the nonmoving party's evidence at the summary-judgment stage is insufficient to establish the nonmoving party's claim.
 
 See, e.g.,
 

 Galloway v. Travelers Ins. Co.
 
 ,
 
 515 So.2d 678
 
 , 684 (Miss. 1987) (holding that Rule 56 embodies the same concepts explained by
 
 Celotex Corp. v. Catrett
 
 ,
 
 477 U.S. 317
 
 ,
 
 106 S.Ct. 2548
 
 ,
 
 91 L.Ed.2d 265
 
 (1986), in construing Federal Rule of Civil Procedure 56 ) ).
 

 ¶ 48. Grand Casinos fully met Rule 56's second alternative (the
 
 Celotex
 
 standard), by demonstrating the California physician's letter is insufficient to establish the pork chop Dianne ate was infected with poisonous bacteria.
 

 ¶ 49. The majority, however, treats the deficiencies of the California physician's letter as a matter of form that should not yet be considered for summary-judgment purposes. Ostensibly-and I truly hope this is the case, for the sake of restauranteurs and the like in Mississippi-the majority finds so on the expectation that more is to come from the treating physician in California.
 

 ¶ 50. But while I hope this is the majority's ultimate position, the majority nevertheless
 departs from this Court's precedent in so holding. In
 
 Glover v. Jackson State University
 
 ,
 
 968 So.2d 1267
 
 , 1274 (Miss. 2007), we reiterated: "It is not enough to say (as many do) that summary judgment should be denied because evidence will, or might, be developed later in discovery-or at trial."
 

 ¶ 51. Yet the majority finds this appropriate in this instance based upon language it reads from
 
 Illinois Central Railroad Co. v. Jackson
 
 ,
 
 179 So.3d 1037
 
 , 1043 (Miss. 2015) : "To be exact, the content of summary-judgment evidence must be admissible at trial although the evidence may be in a form, such as an affidavit, that would not be admissible."
 

 ¶ 52. But this statement from
 
 Jackson
 
 is actually a
 
 Celotex
 
 illustration.
 
 See
 

 Jackson
 
 ,
 
 179 So.3d at
 
 1043 (citing Jeffrey Jackson, Mississippi Civil Procedure § 11:22 (2009) ). Sworn affidavits generally are considered hearsay and not admissible at trial as competent evidence; they are, however, the exception to the requirement that summary judgment be supported or opposed only by admissible evidence.
 
 See
 
 M.R.C.P. 56(e). Thus, a properly sworn affidavit, made on personal knowledge affirmatively showing the affiant is competent to testify to the matter stated therein, while not admissible, may be enough to defeat summary judgment.
 

 Id.
 

 See, e.g.
 
 ,
 
 Rebel Oil Co., Inc. v. Atlantic Richfield Co.
 
 ,
 
 51 F.3d 1421
 
 (9th Cir. 1995) (an expert-opinion affidavit "may defeat summary judgment if it appears that the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit");
 
 but see also
 

 In re Agent Orange Prod. Liab. Litig.
 
 ,
 
 818 F.2d 187
 
 , 193 (2d Cir. 1987) (noting that to defeat summary judgment, expert affidavits cannot involve "mere speculation or idiosyncratic opinion").
 

 ¶ 53. I point this out because the majority's view in this case with regard to the California physician's letter for purposes of Rule 56, appears very similar to the view Tennessee once held with regard to its own Rule 56.
 

 ¶ 54. In
 
 Byrd v. Hall
 
 ,
 
 847 S.W.2d 208
 
 (Tenn. 1993), Tennessee began to contemplate that the
 
 Celotex
 
 standard, which most states (including Mississippi) have unified with in their respective Rule 56 practice, was not a good fit for Tennessee's Rule 56 practice. Then, culminating with
 
 Hannan v. Alltel Publishing Co.
 
 ,
 
 270 S.W.3d 1
 
 , 8-9 (Tenn. 2008), the Tennessee Supreme Court explicitly parted ways with the
 
 Celotex
 
 standard, declaring:
 

 [A] moving party's burden of production in Tennessee differs from the federal burden. It is not enough for the moving party to challenge the nonmoving party to "put up or shut up" or even to cast doubt on a party's ability to prove an element at trial.
 

 ...
 

 In summary, in Tennessee, a moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial.
 

 ¶ 55. But soon thereafter, Tennessee realized it had fallen into a
 
 burning ring of fire
 
 with its newly held standard.
 
 [9]
 
 And in
 
 Rye v. Women's Care Center of Memphis, MPLLC
 
 ,
 
 477 S.W.3d 235
 
 , 264 (Tenn. 2015), the Tennessee Supreme Court parted ways with it, holding: "Because the standard articulated in
 
 Hannan
 
 is unworkable and inconsistent with the history and text
 of Tennessee Rule 56, we ... overrule
 
 Hannan
 
 , and fully embrace the standards articulated in the
 
 Celotex
 
 trilogy."
 

 ¶ 56. Here, whether the California physician's letter was sworn to or not was inconsequential and superfluous to Grand Casinos' actual objection to it. Grand Casinos' sole concern (and what it did indeed object to) was the substance (or lack thereof) of the letter's "content" being allowed to establish that Dianne's illness was caused by poisonous bacteria contained in a pork chop served by Grand Casinos.
 

 ¶ 57. Again, I fully agree with Grand Casinos. The California physician's letter in no way adequately establishes that Dianne suffered from food poisoning-and much less that the pork chop allegedly consumed by the McGintys was infected by poisonous bacteria.
 

 ¶ 58. As far as this record is concerned, the letter makes no mention of poisonous bacteria, or even food poisoning in general, for a reason. And it is not Grand Casinos' burden to demonstrate why.
 

 ¶ 59. The only mention of bacteria in this case comes from Joe's deposition, in which Joe said he was familiar with the incubation time of certain bacteria, having previously worked in the food industry as a senior vice-president and general manager of operations for McCarty Farms. But Joe-as he admitted-is not a qualified expert in the field of bacteriology.
 

 ¶ 60. I also refuse to take any sort of judicial notice, as the majority and the Court of Appeals appear to do in this case, with regard to the alleged fact the McGintys both became ill
 
 soon
 
 after eating the same pork chop. In addition to the pork chop the McGintys said they ate, the McGintys said they both ate "prime rib" the night before at another casino. And at one point in Joe's deposition, Joe indicated that the prime rib could have caused their illness.
 

 ¶ 61. I point out the case
 
 Hairston v. Burger King Corp.
 
 ,
 
 764 So.2d 176
 
 (La. App. 2nd Cir. 2000). There, it was held that a plaintiff failed to carry her burden of proof that her acute gastroenteritis was the result of food poisoning. Her treating physician testified that none of the tests he conducted revealed any bacteria that could have caused food poisoning; however, he could not rule it out.
 

 Id.
 

 at 178
 
 . Notably, the physician also testified that "the incubation for different types of bacteria which can cause food poisoning is anywhere from an hour to a week."
 

 Id.
 

 ¶ 62. Here, besides the alleged fact that Joe and Dianne became ill at some point after eating the pork chop, the only other evidence presented in support of their claim the pork chop was unfit for human consumption, is Joe's recollection that it "tasted bad." While evidence that food "tasted bad" has been held in some cases to constitute a factor for consideration in determining whether food was unfit for consumption, all of the cases I have reviewed where this was held also contained evidence of medically diagnosed food poisoning by a treating physician.
 
 See, e.g.
 
 ,
 
 Smith v. Gerrish
 
 ,
 
 256 Mass. 183
 
 ,
 
 152 N.E. 318
 
 (1926) ;
 
 Schuler v. Union News Co.
 
 ,
 
 295 Mass. 350
 
 ,
 
 4 N.E.2d 465
 
 (1936).
 

 ¶ 63. In my firm opinion, to reach the conclusion reached by the majority and the Court of Appeals in this case that the collective effect of the evidence presented is enough for a jury reasonably to infer that the McGintys became ill from an infected pork chop, requires bootstrapping inference upon inference from the alleged fact both the McGintys became ill some time after eating the porkchop. I do not read any Mississippi precedent as allowing for this.
 

 ¶ 64. The rule expressed in
 
 Geisness v. Scow Bay Packing Co.
 
 ,
 
 16 Wash. 2d 1
 
 ,
 
 132 P.2d 740
 
 , 747 (1942), is universal and sound: "The unwholesome character of food is not established, nor is a prima facie case made, merely by showing that the plaintiff became sick after eating it."
 
 Geisness
 
 ,
 
 132 P.2d at
 
 746 (citing
 
 Poovey v. Int'l Sugar Feed No. 2 Co.
 
 ,
 
 191 N.C. 722
 
 ,
 
 133 S.E. 12
 
 (1926) ;
 
 Gracey v. Waldorf System
 
 ,
 
 251 Mass. 76
 
 ,
 
 146 N.E. 232
 
 (1925) ). Were it otherwise, plaintiffs would be relieved from proving this essential element in virtually any implied-warranty claim involving wholesomeness and fitness of food, which-in effect-would make all restaurants insurers.
 
 See, e.g.
 
 ,
 
 Goodwin
 
 ,
 
 42 So.2d at 404
 
 (warning of the same for negligence actions).
 

 ¶ 65. For these reasons, I concur in part and dissent in part from the majority's decision in this case.
 

 WALLER, C.J., JOINS THIS OPINION.
 

 Like the majority, I too don't mind borrowing from the great Johnny Cash.